USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/17/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                                      :

THE ROMAN CATHOLIC DIOCESE OF       :
ROCKVILLE CENTRE, NEW YORK,         :
                                        :

                      Plaintiff,       :         20-CV-11011 (VEC)
                                        :

          -against-                 :         OPINION AND ORDER
                                        :

ARROWOOD INDEMNITY COMPANY,        :
                                        :

                      Defendant.      :
---------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

        Plaintiff, the Roman Catholic Diocese of Rockville Centre, New York ("the Diocese"),

filed for Chapter 11 protection in the Bankruptcy Court for the Southern District of New York on

October 1, 2020. The Diocese claims its petition was motivated by New York state legislation

that allows alleged victims of sexual abuse to assert claims that had previously been barred by

the statute of limitations. On the same day that it filed for bankruptcy, the Diocese commenced

an adversary proceeding against various insurance companies, including Defendant Arrowood

Indemnity Company ("Arrowood"), seeking a declaratory judgment regarding the scope of its

insurance coverage and damages for breach of contract. On December 29, 2020, Arrowood

moved to withdraw the reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d). For

the reasons discussed below, Arrowood's motion to withdraw the reference is GRANTED.

## BACKGROUND

        On February 14, 2019, New York enacted the Child Victims Act ("CVA"). Mem. of

Law, Dkt. 4 at 3.[1] The CVA expanded the statute of limitations that applies to civil suits against

parties whose omissions or negligence facilitated the commission of child sexual abuse. Chapin

---

[1] The following facts, drawn from the parties' filings, are assumed to be true for the purpose of deciding the
present motion.

Decl., Dkt. 23 ¶ 4.  Pursuant to the CVA, victims of child sexual abuse may now bring suit until they turn 55 years old.  *Id.*  The CVA also revived actions that had been time-barred as of the statute's effective date and allowed victims to file such actions from August 14, 2019 to August 14, 2020.  *Id.*  New York later amended the statute to give victims more time to file revived claims; such claims may now be filed through August 14, 2021.  *Id.*

Although the window to bring such claims has not yet closed, hundreds of alleged victims of child sexual abuse have filed suit against the Roman Catholic Diocese of Rockville Centre, New York, which is the seat of the Roman Catholic Church on Long Island.  *See* Chapin Decl. ¶ 5; First Day Decl., 20-BK-12345, Dkt. 3 ¶ 12.  To facilitate its defense of these claims, many of which are decades old, the Diocese has identified insurance policies it contends were in effect when such abuse allegedly occurred.  Resp., Dkt. 21 at 6.  According to the Diocese, Royal Insurance Company, which is now known as Arrowood Indemnity Company, provided general liability coverage to the Diocese and its members from the Diocese's founding in 1957[2] through September 1, 1976.  Chapin Decl. ¶ 7.  The Diocese alleges that the primary Arrowood policies lacked an aggregate limit and, accordingly, are of significant value to the Diocese.  *Id.* ¶ 8.

The Diocese and Arrowood disagree about the scope of insurance coverage provided by the Arrowood policies.  The Diocese claims that Arrowood has refused to indemnify the Diocese for liability on any CVA claims and has not fully reimbursed the Diocese's defense costs, in violation of Arrowood's obligations pursuant to the relevant insurance policies.  Resp. at 7.  In contrast, Arrowood claims that it has no obligation to defend or indemnify certain claims, including, although not limited to, claims that involve alleged abuse by priests whose conduct was previously known to the Diocese.  *See* Answer, Dkt. 1-2 at 60–61.

---

[2] The Vatican established the Diocese in 1957 from territory that had been part of the Diocese of Brooklyn. First Day Decl., 20-BK-12345, Dkt. 3 ¶ 12

Given the likely financial repercussions of the CVA claims, the Diocese filed for Chapter 11 protection.  Resp. at 5; Mem. of Law at 1.[3]  On the same day it filed its Chapter 11 petition, the Diocese commenced an adversary proceeding against several insurance companies, including Arrowood and the London Market Insurers ("LMI"), to address the coverage disputes.[4]  Chapin Decl. ¶ 14.  In the adversary proceeding, the Diocese seeks a declaratory judgment outlining its rights and the insurance companies' obligations pursuant to the various insurance policies at issue.  *See* Compl., Dkt 1-2 ¶¶ 82–87.  The Diocese also alleges a breach of contract claim against the insurance companies for violating their duty to defend and for disclaiming their obligations to indemnify the Diocese on such claims.  *Id.* ¶¶ 88–92.[5]

On December 29, 2020, pursuant to 28 U.S.C. § 157(d), Arrowood filed a motion to withdraw the reference to the Bankruptcy Court.  *See* Arrowood Motion, Dkt. 1.[6]  The Diocese,

---

[3]      That matter is currently pending before Judge Shelley Chapman in the Southern District of New York Bankruptcy Court under docket number 20-BK-12345.

[4]      The adversary proceeding has the docket number 20-AP-1227.

[5]      The Diocese also brings a separate breach of contract claim against the London Market Insurers ("LMI") only, alleging violations of an aggregate excess agreement.  *See* Compl., Dkt. 1-2 at ¶¶ 93–97.  Because that breach of contract claim does not concern Arrowood, it is not discussed here.

[6]      A few days later, LMI filed its own motion to withdraw the bankruptcy reference.  *See* LMI Motion, 21-CV-71, Dkt. 1.  That action was initially assigned to Judge Edgardo Ramos and was subsequently re-assigned to and is currently pending before Judge John Cronan.  The Diocese has made numerous requests to various Judges for that action to be assigned to the undersigned as a related case, *see* 20-CV-11011, Dkts. 11, 19, 36; 21-CV-71, Dkts. 4, 7, 15, 41, all of which have been denied, *see* 20-CV-11011, Dkt. 20; 21-CV-71, Dkts. 13, 16, 46.

        District courts are not limited to withdrawing references over entire proceedings; Section 157(d) expressly allows district courts to withdraw proceedings "in whole or in part."  28 U.S.C. § 157(d).  The Arrowood and LMI insurance policies differ in several key ways, which may have an impact on the Court's analysis whether the reference should be withdrawn as to those claims.  *See, e.g.*, Resp., Dkt. 21 at 11 (noting that the LMI policies contain pay first provisions while the Arrowood policies may not); Brief of the Unsecured Creditors Committee, Dkt. 28 at 4–7 (discussing an alleged "service of suit" clause in the LMI policies, which is not alleged to be included in the Arrowood policies).  Further, were the reference to be withdrawn in both matters, the ultimate resolution of the declaratory judgment and breach of contract claims turns on the underlying insurance policies and conduct that occurred during different policy periods.  These important differences illustrate why the Court did not view the two motions to be related pursuant to Local Rule 13(a) of this Court's Rules for the Division of Business Among District Judges.

as well as an Official Committee of Unsecured Creditors of the Diocese, oppose the motion. Resp., Dkt. 21; Brief of the Unsecured Creditors Committee, Dkt. 28.

## LEGAL STANDARD

District courts have original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11," 28 U.S.C. § 1334(b), but may refer such cases to the bankruptcy judges for the district, 28 U.S.C. § 157(a). The Southern District of New York automatically refers all such cases to the Bankruptcy Court. *See In re Standing Order of Reference Re: Title 11*, 12-MC-32 (S.D.N.Y. Feb. 1, 2012). But "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d).[7] In this matter, Arrowood, a party to the adversary proceeding pending before the Bankruptcy Court, has made a timely motion to withdraw the reference.[8]

As the moving party, Arrowood has the burden to show cause to withdraw the reference. *Nisselson v. Salim*, No. 12-CV-92, 2013 WL 1245548, at *3 (S.D.N.Y. Mar. 25, 2013). But "cause" is not defined in the statute. In a seminal decision, the Second Circuit established a multi-pronged test to assess whether cause for withdrawal exists. *See In re Orion Pictures*

---

[7] Section 157(d) requires a district court to withdraw a proceeding "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). The conditions for mandatory withdrawal are construed narrowly, applying only "where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *Picard v. Flinn Inv., LLC*, 463 B.R. 280, 283 (S.D.N.Y. 2011) (quoting *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990)). As this matter concerns New York state law contract claims, and not questions of federal law, the portion of the statute mandating withdrawal in certain circumstances is not relevant to this action.

[8] Arrowood's motion to withdraw the reference is timely. Courts in this district have defined timely to mean "as soon as possible after the moving party has notice of the grounds for withdrawing the reference." *In re FMI Forwarding Co., Inc.*, No. 00-BK-41815, 2005 WL 147298, at *6 (S.D.N.Y. Jan. 24, 2005) (collecting cases) (internal citation omitted). Arrowood filed its motion to withdraw the reference the day after it answered the complaint in the adversary proceeding. *Compare* Arrowood Motion, 20-CV-11011, Dkt. 1 (filed on December 29, 2020) *with* Arrowood Answer, 20-AP-1227, Dkt. 51 (filed on December 28, 2020). Given the lack of delay on Arrowood's part, and the Diocese's failure to contest the timeliness of Arrowood's motion, *see generally* Resp., Dkt. 21, the Court finds that Arrowood's motion to withdraw the reference is timely.

*Corp.*, 4 F.3d 1095 (2d Cir. 1993).  Pursuant to *Orion*, a district court must first determine

whether the claims at issue are core or non-core under 28 U.S.C. § 157(b).  *Id.* at 1101.  When

*Orion* was decided, bankruptcy courts could issue final judgments with respect to core claims but

were limited to submitting proposed findings of fact and conclusions of law to district courts for

*de novo* review with respect to non-core claims.  *Id.* at 1100–01.  Once the claims were classified

as core or non-core, and the bankruptcy court's corresponding authority was determined, courts

would then use that information to weigh the remaining *Orion* factors.  Those factors include the

efficient use of judicial resources, uniformity of bankruptcy administration, the parties' jury trial

rights, and the prevention of forum shopping.  *Id.* at 1101.

  In 2011, the Supreme Court held that, in certain circumstances, bankruptcy courts did not

have final adjudicative authority even if the claims were deemed core pursuant to the statute.

*Stern v. Marshall*, 564 U.S. 462, 503 (2011).  The Supreme Court reasoned that the

constitutional grant of judicial power, and not the statutory designation of claims as core or non-

core, determined whether bankruptcy courts had final adjudicative authority over claims.  *Id.* at

482–87.  The Supreme Court found that "bankruptcy courts lack constitutional authority to enter

final judgment on core claims, with three exceptions: (1) the defendant filed a proof of claim in

the bankruptcy proceeding; (2) the right being adjudicated is public rather than private; or (3) the

parties consented to have the bankruptcy court enter final judgment."  *Lehman Bros. Holdings*

*Inc. v. Wellmont Health Sys.*, No. 14-CV-1083, 2014 WL 3583089, at *3 (S.D.N.Y. July 18,

2014) (discussing *Stern*, 564 U.S. at 478,488–95).

  The Second Circuit has not addressed how the *Orion* factors should be adjusted given the

Supreme Court's holding in *Stern*, but courts in this district have generally followed one of two

approaches.[9]  Some courts have replaced *Orion*'s threshold core versus non-core determination with *Stern*'s three-pronged test that determines whether the bankruptcy court has constitutional authority finally to adjudicate a matter.[10]  Other courts have maintained the original *Orion* factors but have added the *Stern* test as a further inquiry.[11]

This Court will follow the second approach, by adding the *Stern* three-pronged test to the *Orion* analysis.  The *Orion* court used the core/non-core distinction as a threshold inquiry because understanding a bankruptcy court's ultimate authority has an impact on the remaining factors.  *See Dynegy Danskammer, L.L.C. v. Peabody Coaltrade Int'l Ltd.*, 905 F. Supp. 2d 526, 530 (S.D.N.Y. 2012) (discussing *Orion*, 4 F.3d at 1101).  Because *Stern* replaced the test previously used to determine whether a bankruptcy court has the power to issue final orders, the *Stern* test must be conducted as part of the threshold inquiry.

But the *Orion* core/non-core distinction is not irrelevant when evaluating the remaining factors.  Even in instances where a bankruptcy court lacks final adjudicative authority under *Stern*, whether a claim is core or non-core may still have an impact on the analysis.  With respect to judicial efficiency, for example, bankruptcy judges have more familiarity than district judges adjudicating core bankruptcy matters, which may make it more efficient for a claim to remain in the bankruptcy court even if the bankruptcy court's findings will be subject to *de novo* review by

---

[9]     In the immediate aftermath of *Stern*, at least one court in this district seemed to have ignored the decision entirely.  *See Coudert Bros. v. Peabody Energy Corp.*, No. 11–CV–4949, 2011 WL 7678683, at *3–5 (S.D.N.Y. Sept. 23, 2011).  This decision is from 2011, suggesting that is not currently an approach taken in this district.

[10]     *See, e.g.*, *Lehman Bros. Holdings Inc. v. Standard Pac. Mortg., Inc.*, No. 19-CV-4080, 2019 WL 7593628, at *1 (S.D.N.Y. Aug. 23, 2019); *Lehman Bros. Holdings, Inc. v. Hometrust Mortg. Co.*, No. 15-CV-304, 2015 WL 891663, at *2 (S.D.N.Y. Feb. 25, 2015); *In re Connie's Trading Corp.*, No. 12-CV-376, 2014 WL 1813751, at *7 (S.D.N.Y. May 8, 2014); *Sec. Inv. Prot. Corp. Bernard L. Madoff Inv. Secs. LLC*, 486 B.R. 579, 582 n. 1 (S.D.N.Y. 2013); *In re Arbco Cap. Mgmt., LLP*, 479 B.R. 254, 262 (S.D.N.Y. 2012); *In re Lyondell Chem. Co.*, 467 B.R. 712, 719 (S.D.N.Y. 2012).

[11]     *See, e.g.*, *Scott v. AIG Prop. Cas. Co.*, No. 17-CV-1052, 2017 WL 1380607, at *2 (S.D.N.Y. Apr. 17, 2017); *Adelphia Recovery Tr. v. FLP Grp., Inc.*, No. 11-6847, 2012 WL 264180, at *3 (S.D.N.Y. Jan. 30, 2012); *Madison Bentley Assocs. v. Bentley Manhattan Inc., LLC*, 474 B.R. 430, 435 (S.D.N.Y. 2012).

a district court. *See Lehman Bros. Holdings Inc.*, 2014 WL 3583089, at *3–4 (finding that judicial efficiency was better served by keeping the action in bankruptcy court given its substantial experience and specialized knowledge, although the bankruptcy court lacked final adjudicative authority over the action); *see also Adelphia Recovery Tr. v. FLP Grp., Inc.*, No. 11-CV-6847, 2012 WL 264180, at *7 (S.D.N.Y. Jan. 30, 2012) (same).

In short, pursuant to *Orion* as modified by *Stern*, in order to determine whether cause exists to withdraw the bankruptcy reference, the Court must evaluate: (a) whether the bankruptcy court has final adjudicative authority over the matter; (b) whether the claims at issue are core or non-core; and (c) whether the remaining factors of judicial efficiency, uniformity, the parties' jury trial rights, and the prevention of forum shopping favor withdrawal.

## DISCUSSION

### I.       The Bankruptcy Court Lacks Final Adjudicative Authority Under *Stern*

In *Stern*, the Supreme Court held that even if a claim is deemed core under the statute, bankruptcy courts lack final adjudicative authority unless "(1) the defendant filed a proof of claim in the bankruptcy proceeding; (2) the right being adjudicated is public rather than private; or (3) the parties consented to have the bankruptcy court enter final judgment." *Lehman Bros. Holdings Inc.*, 2014 WL 3583089, at *3 (discussing *Stern*). None of these exceptions applies here. Arrowood, as the Diocese's alleged insurer, has not filed a claim against the Diocese's estate in the underlying bankruptcy proceeding, and the parties have not consented to the bankruptcy court entering a final judgment in this matter. *See* Mem. of Law at 18.

Moreover, the rights being adjudicated are private. Public rights derive from "a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490. Although the "exact contours of the public rights exception" remain unclear, a state

law breach of contract claim does not implicate a public right. *Dynegy Danskammer*, 905 F. Supp. 2d at 531; *see also In re Arbco Cap. Mgmt., LLP*, 479 B.R. 254, 266 (S.D.N.Y. 2012) (finding that state common law claims, including breach of contract, "are indisputably private rights"). Here, the Diocese seeks a declaratory judgment to determine its rights under a contract, and it alleges breach of contract. These are quintessential state common law claims and, accordingly, they do not involve public rights.[12]

Because Arrowood has not filed a claim against the Diocese's estate, the parties have not consented to the Bankruptcy Court entering a final judgment, and the rights involved are private, the Bankruptcy Court does not have constitutional authority to enter a final judgment in this matter. Accordingly, were the Diocese's claims against Arrowood to remain before the Bankruptcy Court, that Court would be limited to submitting proposed findings of fact and conclusions of law for *de novo* review by the district court. This threshold determination is important because it has an impact on the Court's consideration of whether the remaining *Orion* factors show that cause exists to withdraw the bankruptcy reference.

## II. The Claims at Issue Are Non-Core Under *Orion*

A core claim "invokes a substantive right under the Bankruptcy Code or that could arise only in the context of a bankruptcy case," whereas a non-core claim "is related to a case under title 11 and might have a conceivable effect on the estate." *Lehman Bros. Holdings Inc.*, 2014 WL 3583089, at *2 (cleaned up). Determining whether a contract claim is core or non-core requires consideration of "(1) whether [the] contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." *Scott v. AIG Prop. Cas. Co.*, No. 17-CV-1052, 2017 WL 1380607, at *3–4 (S.D.N.Y. Apr. 17, 2017) (citing

---

[12]    The fact that the Diocese seeks a declaratory judgment does not transform a contract dispute under New York law into a dispute concerning public rights. *Cf. Simler v. Conner*, 372 U.S. 221, 223 (1963) (per curiam) ("The fact that the action is in form a declaratory judgment case should not obscure the essentially legal nature of the action.").

*In re Millennium Seacarriers, Inc.*, 419 F.3d 83, 97 (2d Cir. 2005)). Claims for pre-petition contract damages are usually non-core. *See Orion*, 4 F.3d at 1102; *Scott*, 2017 WL 1380607, *3 (collecting cases).

The claims at issue in this matter are non-core. The Diocese's case against Arrowood concerns who bears financial responsibility for certain tort claims; it does not concern the validity of the underlying claims. Resolution of this matter requires contract interpretation to ascertain the Diocese's rights pursuant to insurance policies that exist independent of the bankruptcy case. Moreover, the insurance policies at issue are pre-petition contracts that were allegedly entered into decades before the bankruptcy petition was filed, further demonstrating that the claims at issue are non-core. *See In re Coudert Bros.*, No. 11-CV-4949, 2011 WL 7678683, at *5 (S.D.N.Y. Nov. 23, 2011) ("Where a contract sued upon was formed prior to the bankruptcy petition, it will generally be highly unlikely that a proceeding based on that contract turns on the bankruptcy laws."). As the Diocese's claims against Arrowood do not turn on the bankruptcy laws, arose before the bankruptcy petition was filed, and are independent of the bankruptcy proceedings, the claims at issue are non-core.

The Diocese argues that the Second Circuit held in *In re U.S. Lines, Inc.*, that claims analogous to the claims against Arrowood are core claims. 197 F.3d 631 (2d Cir. 1999). In *U.S. Lines*, U.S. Lines and the U.S. Lines Reorganization Trust sought a declaratory judgment to establish the Trust's rights under various insurance contracts. *Id.* at 634. Among U.S. Lines creditors were over 12,000 employees who had filed over 18,000 claims, primarily for asbestos-related injuries sustained while sailing on various U.S. Lines ships over a 40-year period. *Id.* at 635. The insurance contracts at issue provided a source of funds for those personal injury claims. *Id.*

On appeal, the Second Circuit considered whether the adversary proceeding fell within the bankruptcy court's core jurisdiction. *Id.* at 634. In so doing, the Court recognized that "contract claims are not rendered core simply because they involve property of the estate." *Id.* at 637. *See also id.* at 638 ("[W]here the insurance proceeds would only augment the assets of the estate for general distribution, the effect on the administration of the estate was insufficient to render the proceedings core. . .") (citing *Orion*, 4 F.3d at 1102).

The Second Circuit also acknowledged that indemnity insurance contracts may be "the most important asset" of the debtor's estate and, as such, "are bound to have a significant impact on the administration of the estate." *Id.* at 638. The question before the Second Circuit was whether such circumstances render a proceeding core. Looking at the facts before it, the Second Circuit found that the insurance proceeds at issue "represent the only potential source of cash available" to the asbestos-injury claimants and that the insurance contracts at issue had "pay-first provisions," which required the debtor to pay the claims before seeking indemnity from the insurance carrier. *Id.* Because the debtor was insolvent, satisfying the pay-first requirement would require the debtor to utilize "complex, creative payment schemes," which may or may not ultimately satisfy the requirement. *Id.* at 638–39. Recognizing that the insurance contracts were the only source of cash and that accessing those insurance proceeds required the estate to make payments first, the Second Circuit found that the declaratory judgment proceedings "directly affect the bankruptcy court's core administrative function of asset allocation among creditors, and for that reason they are core." *Id.* at 639.

The facts in *U.S. Lines* are different than those in the matter at hand. Here, the Diocese is not claiming that the insurance policies are the *only* asset of the estate; the Diocese contends instead that the Arrowood and LMI policies are collectively the "single largest," "most

significant," and "an essential" asset of the estate.  Resp. at 2, 9, 22.[13]  Significantly, there is no pay-first provision in the Arrowood insurance policies.  Mem. of Law at 16 (noting the Arrowood policies do not have pay first provisions); Resp. at 11 (recognizing that it "may be true" that the Arrowood policies lack pay-first provisions).  On its face, it is unclear whether the holding in *U.S. Lines* applies to all instances where the insurance policies are "the most important asset," *U.S. Lines*, 197 F.3d at 638, or if the holding is limited to circumstances where the policies are the only asset *and* pay-first provisions necessarily require the reorganization of the estate to access the funds, *id.* at 638–39.

But the subsequent cases in this district that have construed *U.S. Lines* — except for one — have limited its holding to its specific facts.  In 2005, the Second Circuit explained that it found core jurisdiction in *U.S. Lines* "based on the mutually re-enforcing effects of two factors," namely that "the policies were the only asset available" and that "the policies were pay-first policies that required the trustee to pay the claims and then seek indemnification."  *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 448 (2d Cir. 2005).  As the pay-first provisions implicated a core bankruptcy function, the Second Circuit in *Mt. McKinley* found that the proceeding at issue in *U.S. Lines* was properly deemed core.

_____

[13]    The Diocese, apparently in a snit because the Court declined its repeated entreaties to have the motion to withdraw the reference by LMI related to Arrowood's motion, filed a single brief and supporting declaration to address both motions, even though the motions are pending before different judges and involve different insurance policies.  Accordingly, it is not entirely clear from the Diocese's expert how critical the *Arrowood* policies are, as he swears only that "the proceeds from the insurance claims under the Arrowood *and LMI* insurance policies are likely to be the largest source of recovery from the CVA claimants."  Moore Decl., Dkt. 24 ¶ 17 (emphasis added).

Putting aside the ambiguity created by combining the anticipated insurance proceeds from two different sets of policies, only one set of which is at issue here, the Court reserves judgment on whether this contention is accurate.  *See* Mem. of Law at 15–16 (noting that the Diocese has many substantial assets including $93 million listed on its Schedule A/B).  Instead of explaining why such assets are unavailable or providing any financial information to demonstrate that the insurance policies are indeed the largest asset of the estate, the Diocese relied on a conclusory statement by its retained restructuring advisor that "it is expected that the CVA liabilities of the Debtor will significantly exceed the other available assets of the Debtor's estate, and that the proceeds from insurance claims under the Arrowood and LMI insurance policies are likely to be the largest source of recovery for the CVA claimants."  Moore Decl. ¶ 17.  Although the Court assumes that the Arrowood insurance proceeds are indeed a considerable asset, it gives no deference to the consultant's ambiguous *ipse dixit* about the relative size of this asset.

Subsequent cases have reinforced this reasoning. Judge Holwell found that the Second Circuit characterized the proceeding in *U.S. Lines* as core "only because pay-first provisions . . . required U.S. Lines to satisfy claims from its own funds before seeking indemnification" and "since insurance proceeds represented the only potential source of cash available to the personal injury claimants, declaratory judgment was necessary to effectuate an equitable distribution of the bankruptcy estate." *DeWitt Rehab. & Nursing Ctr., Inc. v. Columbia Cas. Co.*, 464 B.R. 587, 592 (S.D.N.Y. 2012) (cleaned up). And Judge Oetken noted that *U.S. Lines* "has been narrowed by later rulings" and emphasized that the case "involved an insurance policy that contained a 'pay-first' provision." *In re: Residential Cap., LLC*, No. 15-CV-2712, 2015 WL 9302834, at *4 (S.D.N.Y. Dec. 21, 2015). This caselaw suggests that *U.S. Lines* should be limited to its facts: a declaratory judgment action about the scope of insurance policies is only core when the insurance policies are the lone asset and provisions in the insurance policies necessarily implicate core bankruptcy functions to enable the proceeds of the policies to be accessed.

A 2002 decision by Judge Koeltl — heavily relied upon by the Diocese — goes the other way. Judge Koeltl found that "what was critical in *United States Lines* was not that the policy contained a pay-first provision but rather that the bankruptcy court could not easily proceed with its core function of effecting an equitable reorganization without deciding the coverage dispute in the case." *In re Cnty. Seat Stores, Inc.*, No. 01-CV-2966, 2002 WL 141875, at *5–6 (S.D.N.Y. Jan. 31, 2002). Judge Koeltl further acknowledged that the insurance proceeds at issue in the matter before him "may also be the most important asset of the estate." *Id.* at *6. Accordingly, Judge Koeltl found that the coverage action before him was core "because it threatens to affect a core bankruptcy function in a direct manner." *Id.*

The Court declines to follow *County Seat Stores* and will instead follow the majority approach that limits the *U.S. Lines* holding to its facts. *County Seat Stores* was decided in 2002,

before the Second Circuit found that the holding in *U.S. Lines* was "based on the mutually re-enforcing effects" of the insurance proceeds being the only asset available and the policies' pay-first provisions. *Mt. McKinley*, 399 F.3d at 448.[14] The Court is bound to follow the Second Circuit's latest interpretation. Moreover, *County Seat Stores* may be inapposite to the matter at hand as it "involved an insurance policy owned by the debtor that . . . provided the only source of potential payment for tort claims . . . ." *See id.* at 450 (discussing the holding in *County Seat Stores*). Here, the Diocese argues that the Arrowood and LMI insurance policies are the single largest, but admittedly not the only, available asset. Resp. at 2. Accordingly, the Court declines to read expansively *U.S. Lines* and instead limits its holding to its facts. Because the Diocese acknowledges that the insurance proceeds are not the estate's only asset and because the Arrowood policies do not include pay-first provisions, the claims at issue are non-core.

The Court is not persuaded by the Diocese's remaining arguments that the claims at issue are core. The Diocese contends that because "the [pay-first] provisions of the LMI insurance policies render that dispute core, Arrowood cannot be severed; insurance coverage under the Arrowood insurance policies must be decided alongside the LMI insurance policies." Resp. at 17. The Diocese contends that a decision otherwise would lead to inconsistent rulings "on the same type of insurance policies concerning the same type of CVA Claims." *Id.* at 18. But the Diocese fails to explain — and cites no caselaw to support — why the Court should consider its argument that claims against LMI are core in deciding the separate question of whether claims against Arrowood are core. Reply, Dkt. 33 at 3–4. 28 U.S.C. § 157(d) recognizes that proceedings may be withdrawn "in whole or in part." 28 U.S.C. § 157(d). Accordingly, the Court sees no reason to transport hypothetical findings that might be made with respect to the

---

[14]    It is also worth noting that the Second Circuit in *Mt. McKinley Ins.* "assum[ed] without deciding that *County Seat Stores* was correctly decided." *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 450 (2d Cir. 2005).

dispute over coverage under the LMI policies into this dispute over coverage under the Arrowood policies.[15]  That is especially the case because the Arrowood and LMI insurance policies are different in notable ways, including with respect to pay-first requirements. Moreover, the policies cover different time periods, ameliorating some of the concern about inconsistent rulings.  In short, whether the claims against LMI are core is not determinative of whether the claims against Arrowood are core.

The Diocese further argues that the consent-to-settlement provisions in Arrowood's insurance policies render the claims at issue core.  The Diocese contends that these provisions are analogous to pay-first provisions because they "interfere with the Bankruptcy Court's ability to carry out its core function of efficiently effecting an equitable reorganization."  Resp. at 13. But consent-to-settlement provisions are not analogous to pay-first provisions.  Pay-first requirements impose on an insolvent company the need to engage in "complex, creative payment schemes" before the insurance proceeds at issue can be accessed, necessarily implicating the "bankruptcy court's core administrative function of asset allocation among creditors."  *U.S. Lines*, 197 F.3d at 639.  Consent-to-settlement provisions, on the other hand, do not require any allocation of assets from the estate.  Instead, the provisions — assuming they are valid, an issue on which the Court takes no position at this time — require that Arrowood consent to any settlement that the Diocese wants to argue should be covered by insurance proceeds.[16]  Adding another party to the negotiating table during settlement discussions does not require the estate to make any payments at all, let alone payments that are prerequisites to insurance coverage.

---

[15]     The Court takes no position as to whether the claims against LMI are core or non-core.  That matter is pending before Judge Cronan.  *See* 21-CV-71.

[16]     Arrowood has indicated that, notwithstanding the coverage dispute, it is ready and willing to participate in the bankruptcy claims process "if invited and/or permitted by the Bankruptcy Court to do so."  Reply, Dkt. 33 at 7–8.

Accordingly, the consent-to-settlement provisions do not render the claims against Arrowood core.

In short, because the Diocese's claims against Arrowood do not turn on bankruptcy laws, arose before the bankruptcy petition was filed, are independent of the bankruptcy proceedings, and do not fall under the *U.S. Lines* exception, the claims at issue are non-core.

## III.    The Remaining *Orion* Factors Support Withdrawal of the Reference

Armed with the threshold determinations that the Bankruptcy Court lacks final adjudicative authority over the Diocese's claims against Arrowood and that these claims are non-core, the Court is ready to consider the remaining *Orion* factors: judicial efficiency, uniformity, the parties' jury trial rights, and the prevention of forum shopping.  For the reasons discussed below, the Court finds that these factors favor withdrawal of the bankruptcy reference.

### A.  Judicial Efficiency

Because the Bankruptcy Court lacks final adjudicative authority over these claims, were the Court to deny Arrowood's motion, the Bankruptcy Court would be limited to submitting proposing findings of fact and conclusions of law for *de novo* review by a district court.  In such circumstances, it is generally "inefficient to allow the proceedings to go forward, knowing that they will have to be substantially repeated." *Dynegy Danskammer*, 905 F. Supp. 2d at 533 (cleaned up); *see also DeWitt Rehab. & Nursing Ctr., Inc.*, 464 B.R. at 592 ("Such duplicate reviews of the contracts and facts are costly and time-consuming, and unnecessarily expend judicial resources.").

That said, having the Bankruptcy Court enter proposed findings of fact and conclusions of law for a district court's *de novo* review is not always an inefficient way to proceed.  For example, "in cases where the bankruptcy court is more familiar with the record or already has extensive experience in the matter, it may be most efficient for the bankruptcy court to propose

recommendations first, even though the district court ultimately would have to review them de novo." *Dynegy Danskammer*, 905 F. Supp. 2d at 533 (collecting cases); *see also Extended Stay, Inc. v. Blackstone Grp.*, 466 B.R. 188, 207 (S.D.N.Y. 2011) (noting that in certain circumstances "the bankruptcy court's proposed findings of fact and conclusions of law will narrow the issues to be resolved by this Court").

In this case, efficiency is best served by having this court rule directly without the Bankruptcy Court first issuing proposed findings of fact and conclusions of law. Although "withdrawing the claims arising under bankruptcy law could be an inefficient allocation of judicial resources given that the Bankruptcy Court generally will be more familiar with the facts and issues involved in those claims," *In re: FKF 3, LLC*, No. 13-CV-3601, 2016 WL 4540842, at *20 (S.D.N.Y. Aug. 30, 2016) (cleaned up), the claims at issue in this matter are non-core, and they arise under contract law, not bankruptcy law. Contract disputes are the bread and butter of district courts; bankruptcy courts do not have any "specialized knowledge" that "will contribute to swifter resolution of the claims at issue." *Lehman Bros. Holdings Inc.*, 2014 WL 3583089, at *4.

Moreover, because the Diocese's bankruptcy case is relatively new, it is unlikely that the Bankruptcy Court is much more familiar with the claims and issues in this matter than this Court is. Courts have found it inefficient to withdraw a bankruptcy reference when a bankruptcy court had been presiding over a matter for a number of years. *See, e.g.*, *California v. Enron Corp.*, 05-CV-4079, 2005 WL 1185804, at *3 (S.D.N.Y. May 17, 2005) (finding that judicial efficiency weighed in favor of not withdrawing the reference in part because the bankruptcy court had presided over the bankruptcy case for more than three years); *Nisselson*, 2013 WL 1245548, at *6 (reaching a similar conclusion given the bankruptcy's court two years of involvement); *Extended Stay, Inc.*, 466 B.R. at 206 (same).

The Diocese filed its bankruptcy petition a little over seven months ago. *See* Petition, 20-BK-12345, Dkt. 1 (filed on October 1, 2020). And with respect to the adversary proceeding, Arrowood's motion to withdraw the bankruptcy reference was filed the day after it filed its answer. *Compare* Arrowood Motion, 20-CV-11011, Dkt. 1 (filed on December 29, 2020) *with* Arrowood Answer, 20-AP-1227, Dkt. 51 (filed on December 28, 2020). Although a motion for judgment on the pleadings remains pending before the Bankruptcy Court, *see* Motion, 20-AP-1227, Dkt. 68, and oral arguments on that motion were conducted last week, that motion has not been decided. Although the Diocese claims that the Bankruptcy Court has "acquired a detailed understanding of the Debtor, its operations, and the CVA claims," it only lists actions it has taken to support this contention; the Diocese did not note any substantive decisions or actions by the Bankruptcy Court. Resp. at 16 (listing the filing of two adversary proceedings, the filing of the bar date motion, and the negotiation of a confidentiality agreement). In short, "[t]his case does not present a situation in which the bankruptcy court has presided over the case for many years and is therefore familiar with the parties and the underlying issues in the case." *Scott*, 2017 WL 1380607, *4.

The Diocese further argues that the overlap between Arrowood and LMI's arguments and defenses and the existence of CVA claims that span Arrowood and LMI's policy periods makes litigating in different forums "an inefficient use of judicial, Debtor and creditor resources that risks inconsistent outcomes." Resp. at 19; *see also id.* 17–19; Chapin Decl. ¶ 12. The Court disagrees. Even if the arguments and defenses are similar, the underlying insurance policies are different, the covered time periods are different, and the facts to be applied are different. Moreover, by their nature, claims that "straddle" policy periods written by different insurers must be submitted to the different insurance carriers;[17] resolving declaratory judgment actions

---

[17] The Diocese recognizes that no matter which court adjudicates these issues, claims that "straddle" both policy periods will have to involve both insurance companies. *See* Chapin Decl., Dkt. 23 ¶ 12 ("With respect to

with respect to those carriers in two different courts does not further complicate this process inasmuch as the resolution of coverage *vel non* under one policy is not dispositive of coverage under the other. While there will undoubtedly be some common questions of law (and perhaps some overlapping questions of fact), the underlying insurance policies and the policy periods at issue are sufficiently different such that it is not inefficient for the claims with respect to each policy to be heard in different courts.

In short, withdrawal of the reference is the most efficient course of action. As the claims at issue are non-core contract claims that were recently filed, the Bankruptcy Court does not have any specialized knowledge or familiarity with the claims, making it similarly situated to the District Court in this respect. Because the Bankruptcy Court does not have final adjudicative authority over these claims and could only submit proposed findings of fact and conclusions of law for *de novo* review by a district court, "withdrawal will avoid the duplication of effort in resolving the case — a more efficient use of judicial resources." *Scott*, 2017 WL 1380607, *4.

### B. Uniformity

This factor encompasses both the uniform administration of bankruptcy law and intra-case uniformity. *See Dynegy Danskammer*, 905 F. Supp. 2d at 533–34 (focusing on whether "bankruptcy-specific legal analysis" is required when evaluating this factor); *Lehman Bros. Holdings Inc.*, 2014 WL 3583089, at *5 (considering "intra-case uniformity" among similar claims brought in the bankruptcy proceeding). With respect to uniformity of bankruptcy law, this factor is neutral because the claims at issue are non-core claims that do not arise under bankruptcy law. *See Dynegy Danskammer*, 905 F. Supp. 2d at 533–34 ("Courts routinely have found no benefit [to the uniform administration of bankruptcy law] where claims are based on state law.") (collecting cases).

---

those claims, the Debtor has provided notice to both Arrowood and the LMI, and seeks coverage under both the [Arrowood's] insurance policies and the LMI's insurance policies.").

Additionally, for the reasons already discussed, concerns about intra-case uniformity are overblown. The claims at issue relate to whether the Diocese has insurance coverage under the Arrowood policies for valid claims made against the Diocese and is, accordingly, distinct from the underlying CVA claims before the Bankruptcy Court. Moreover, the claims against Arrowood and LMI are based on different insurance policies that were in effect over different time periods, further ameliorating any concerns about inconsistent rulings. Accordingly, considerations of intra-case uniformity do not weigh against withdrawing the reference.

### C. The Parties' Jury Trial Rights

The parties' jury trial rights point slightly in favor of withdrawing the reference. Arrowood has demanded a jury trial on these claims. Mem. of Law at 21–22; Answer at 62. Bankruptcy courts are prohibited from conducting jury trials on claims over which they lack final adjudicative authority. *See Orion*, 4 F.3d at 1101 (noting that a bankruptcy court may not hold a trial over non-core matters); *FKF 3, LLC*, 2016 WL 4540842, at *14 n.11 (extending *Orion* to matters that fall beyond a bankruptcy's court's final adjudicative authority). As recognized in *Orion*, "a district might find that the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference." *See Orion*, 4 F.3d at 1101. In this matter, Arrowood's invocation of its jury trial right weighs in favor of withdrawing the reference.

But, as the Diocese rightly points out, *see* Resp. at 21, "a party's entitlement to a jury trial does not necessitate immediate withdrawal of the bankruptcy reference." *Lehman Bros. Holdings Inc. v. Standard Pac. Mortg., Inc.*, No. 19-CV-4080, 2019 WL 7593628, at *2 (S.D.N.Y. Aug. 23, 2019). Such a finding would negate the interest in efficiency, as no matter how inefficient, the entitlement to a jury trial would necessitate withdrawal. *See Extended Stay, Inc.*, 466 B.R. at 198, 198 n.38 (holding that automatic withdrawal upon invocation of a jury right would run counter to judicial economy); *Lehman Bros. Holdings Inc.*, 2019 WL 7593628,

at *2 (collecting cases with the same holding). When efficiency counsels against withdrawing the reference, courts weigh the jury factor more heavily the more imminent and likely a trial. *Lehman Bros. Holdings Inc.*, 2014 WL 3583089, at *5; *In re: FKF 3, LLC*, 2016 WL 4540842, at *14. In this matter, for the reasons already discussed, concerns for efficiency support withdrawing the reference. Accordingly, whether jury trial rights "trump" judicial efficiency is an irrelevant consideration. *See Extended Stay, Inc.*, 466 B.R. at 206.

Although Arrowood's invocation of jury rights points in favor of withdrawing the reference, the Court does not attach much weight to this factor. This case is in its early stages and is far from trial ready: dispositive motions have not yet been decided, and discovery is not complete. Resp. at 21. Like most other civil cases, this case is unlikely to be tried; it is more likely to settle or to be resolved on dispositive motions. Because it is premature to consider whether Arrowood will utilize its jury trial right, the fact that it has invoked the right weighs only slightly in favor of withdrawing the reference.

### D. Forum Shopping

There is no indication that Arrowood was engaged in forum shopping when it moved to withdraw the bankruptcy reference.[18] Because the Bankruptcy Court cannot enter a final judgment over these claims, this matter will end up before a district court regardless of the outcome of this motion. Accordingly, withdrawal of the bankruptcy reference does not promote forum shopping. *See Brown Publ'g Co. v. Brown*, No. 15-MC-0531, 2017 WL 455418, at *5 (E.D.N.Y. Feb. 1, 2017) (holding that the inability of a bankruptcy court to enter a final judgment eliminates concerns over forum shopping). Additionally, there is no reason to think

---

[18] The Diocese argues that this factor requires Arrowood to show that allowing the claims to proceed in the Bankruptcy Court promotes forum shopping. Resp. at 20 ("Defendants provide no argument that allowing the Adversary Proceeding to proceed in the Bankruptcy Court is 'forum shopping.'"). But the Diocese misconstrues what must be shown. Arrowood does not have to demonstrate that maintaining the status quo promotes forum shopping; instead, the factor considers whether the motion to withdraw the bankruptcy reference was motivated by forum shopping. *See Scott*, 2017 WL 1380607, at *4.

that forum shopping, "as opposed to a genuine desire for more efficient adjudication," *Dynegy Danskammer*, 905 F. Supp. 2d at 533, influenced Arrowood's decision to file its motion. Because forum shopping does not appear to have driven Arrowood's decision to move to withdraw the reference, this factor is neutral.

Taken together, the *Orion* factors as modified by *Stern* support withdrawal of the bankruptcy reference. The Bankruptcy Court lacks final adjudicative authority over these non-core claims. Although concerns about uniformity and forum shopping are neutral, the judicial interest in efficiency and Arrowood's jury trial rights both counsel in favor of granting the motion to withdraw the reference.

## CONCLUSION

For the reasons discussed above, Arrowood has shown cause for permissive withdrawal of the Diocese's claims against it pursuant to 28 U.S.C. § 157(d). Accordingly, Arrowood's motion to withdraw the bankruptcy reference is GRANTED.

The Clerk of Court is respectfully directed to terminate the open motion at docket entry 1. The Clerk is further directed to delete all parties except Plaintiff, the Roman Catholic Diocese of Rockville Centre, New York, and Defendant, Arrowood Indemnity Company, from the case caption and from the ECF list of parties. The Court has withdrawn the bankruptcy reference only with respect to the Diocese's claims against Arrowood. The Court has not withdrawn the reference with respect to any other parties or claims, including those claims currently pending before Judge Cronan. If any party or entity believes it should be included as a party in this matter, it is welcome to file such a motion in accordance with the Federal Rules of Civil Procedure.

**SO ORDERED.**

Date: **May 17, 2021**
      **New York, NY**

_____
        **VALERIE CAPRONI**
        **United States District Judge**