M4E3ROMC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   THE ROMAN CATHOLIC DIOCESE OF
     ROCKVILLE CENTRE, NEW YORK,
 4
                     Plaintiff,              New York, N.Y.
 5
                v.                           20 CV 11011 (VEC)
 6
     ARROWOOD INDEMNITY COMPANY,
 7
                     Defendant.
 8
     ------------------------------x         Conference
 9
                                             April 14, 2022
10                                           11:00 a.m.

11   Before:

12                    HON. VALERIE E. CAPRONI,

13                                            District Judge

14                        APPEARANCES

15

16
     REED SMITH, LLP
17        Attorneys for Plaintiff
     BY:  TIMOTHY LAW
18            JOHN BERRINGER

19   COUGHLIN MIDLIGE & GARLAND
          Attorneys for Defendant Arrowood
20   BY:  ADAM SMITH
              MELISSA NATALB
21               -and-
     PORZIO, BROMBERG & NEWMAN
22   BY:  ROBERT SCHECHTER

23   BURNS BOWEN BAIR
          Attorney for Intervenor Unsecured Creditors Committee
24   BY:  JESSE BAIR
              BRIAN CAWLEY
25
```

M4E3ROMC

```
 1            (Case called)
 2            THE DEPUTY CLERK:  Counsel, please state your
 3    appearance for the record.
 4            MR. LAW:  Timothy Law from Reed Smith for the Roman
 5    Catholic Diocese of Rockville Centre.  I'm here with my
 6    colleague John Berringer.
 7            THE COURT:  Good morning.  You can take your mask off
 8    when you're speaking.
 9            Front table can sit down.  Take it off when you're
10    speaking.
11            MR. SMITH:  Good morning.  Adam Smith from Coughlin
12    Midlige & Garland on behalf of the defendant Arrowood.  I'm
13    joined by Melissa Natalb and Rob Schechter our co-counsel with
14    Porzio, Bromberg & Newman.
15            THE COURT:  Good morning, Ms. Natalb, and
16    Mr. Schechter.
17            MR. BAIR:  Good morning.  Jesse Bair from Burns Bowen
18    Bair, special insurance counsel on behalf of the Official
19    Committee of Unsecured Creditors.  With me today is my
20    colleague Brian Cawley.
21            THE COURT:  Good morning.  Please be seated,
22    everybody.
23            Let me tell you where I see this morning's conference
24    to be going.  I've got six big topics, these are the buckets
25    that I think everything, the buckets that issues fall into.
```

M4E3ROMC

1          First is the issue of the current mediation that's

2     going on in the bankruptcy proceeding.

3          Second is the issue of discovery relative to the

4     actual policies that are at issue.

5          Third would be discovery on what I'm sort of calling

6     the global defenses, failure to give timely notice, known loss

7     defense and failure to cooperate.

8          Fourth would be the counterclaims about Father Romano

9     and the other priests that would be the applicability of the

10    expected or intended exclusion.

11         Fifth is the issue of defense costs, both whether it's

12    pro rata or joint and several, and whether there should be

13    discovery relative to the reasonableness of Jones Day's fees.

14         And lastly is sort of which underlying claims are at

15    issue, is this just pre-petition claims that were filed in New

16    York State or does it also include claimants who submitted

17    proofs of claim in the bankruptcy proceeding.

18         Those are my six buckets.  Does everybody agree that

19    covers the waterfront?

20         MR. LAW:  Yes, your Honor.  I think so.

21         MR. SMITH:  Yes, your Honor.

22         MR. BAIR:  Yes, your Honor.

23         THE COURT:  So let's start with the issue of whether

24    the issues of the duty to defend and related issues can be

25    decided in mediation in the bankruptcy proceeding.

M4E3ROMC

1            Do you want to be heard on that, Mr. Law or

2    Mr. Berringer?

3            MR. LAW:  Yes, your Honor.  Thank you.

4            The current mediation is scheduled for a three-day

5    in-person session on the 26th, 27th and 28th of this month.  In

6    that mediation, we're going to try to get the insurance

7    companies to settle their obligations.  If that's successful,

8    they'll surely seek a release of all their liabilities under

9    their insurance policies, and that would include the defense

10   costs issue.

11           The defense cost issue could also be considered as

12   part of the mediation as a separate issue.  But, the more

13   likely way that it's going to get resolved is through a more

14   global resolution if that's reached.

15           THE COURT:  That was not really what I understood your

16   argument to be, but okay, that I understand.

17           Mr. Smith.

18           MR. SMITH:  Your Honor, the mediation was ordered by

19   Judge Chapman to address plan of reorganization for the

20   Diocese.  Our coverage issues, which we've had little to no

21   discovery on, and the involuntary production has not been

22   successful, are not part of the mediation.

23           THE COURT:  Right, but maybe I'm wrong, maybe I

24   misunderstood what Mr. Law just said.  Mr. Law has high hopes

25   that this mediation is going to result in Arrowood saying in

M4E3ROMC

1  exchange for X dollars, release me from everything that goes

2  into the pool.  The Lloyd's group does the same thing.  So the

3  Catholics then have some sense of the pool of money that's

4  available to settle all these cases.

5        That's what he's hoping for.  If that happens, that

6  resolves all of this, correct?

7        MR. SMITH:  Oh, if we reached a resolution as to our

8  coverage obligations, certainly that would resolve this case.

9        THE COURT:  Okay.

10       MR. SMITH:  That I agree with.

11       THE COURT:  I think that's all he said.  That would be

12  wonderful and good luck.  God speed.  Let's hope that happens.

13       Mr. Law, what I hear Mr. Smith saying is they don't

14  have enough information for this to be a particularly

15  productive mediation yet.

16       MR. LAW:  Yes, your Honor.  I think they've gotten all

17  of the information they could possibly ask for from the

18  Diocese.

19       THE COURT:  Apparently not.

20       MR. LAW:  I mean, I don't know what else they want.

21  We've given them everything in our possession that they've

22  asked for.  As far as I can tell.

23       THE COURT:  Is that right?

24       MR. LAW:  We've given them 80,000 documents.

25       THE COURT:  I don't care how many pages.  Pages is the

M4E3ROMC

1     most misleading data point ever in discovery.  But be that as

2     it may.  All right, Mr. Smith, what is it you want that you

3     don't have?

4          MR. SMITH:  Your Honor, well, I'll start with you

5     don't know what you don't have if you don't have it.

6          More importantly, we do know we are missing a

7     significant amount of documents.  The way that these

8     documents -- in this voluntary production was produced was

9     extremely haphazard.  Personnel files for one particular priest

10    found in 20 different locations that you had to piece together.

11    They are not complete.  They're missing big sections of them.

12    Secret files were missing big sections of them.

13          THE COURT:  Do you have secret files?  Do you have any

14    of the secret files?

15          MR. SMITH:  We may have some of them.  Again, it's

16    because we weren't given Bates number 1 through 100 is the file

17    for X priest.  We weren't given it that way.  So, they don't

18    tell you at what Bates number because we didn't do the formal

19    discovery.  We're given a certain amount of pages, which I am

20    glad your Honor said it before I did about the number of pages.

21    And it's left to us to figure out the documents we want, where

22    are they.  They're not all there.  We know they are not all

23    there.  We just received, maybe less than two weeks ago, maybe

24    two weeks ago a privilege log that is going to create all sorts

25    of issues about what's being withheld.  There are a number of

M4E3ROMC

1   holes, and they know they haven't given us everything.  There

2   are certain things they've simply said we are not giving.

3          We had at one point given them a laundry list of

4   things, and some of them they said we'll give them to you,

5   other things they said we are not giving you.

6          It's been an extremely haphazard and inefficient and

7   frankly has not helped us prepare for the mediation.  We're

8   lacking.  And now, while they've represented that this was

9   about defense costs, we only want to focus on defense costs,

10  just because we are talking about the mediation, we received a

11  demand from them that and I won't disclose --

12          THE COURT:  I don't want to know anything about it.

13          MR. SMITH:  The only point I want to raise, it doesn't

14  address our indemnity obligation.  Again, we'd love to be

15  prepared if we could, but we're not.

16          THE COURT:  Here's the thing.  I'm not in charge of

17  the mediation.  I would hope that the mediation would be

18  successful and useful.  I presume, Mr. Smith, everything you've

19  just told me you've also told the mediator.  You are saying

20  yes, and Mr. Law is shaking his head no, no, no.

21          MR. SMITH:  We haven't had an actual mediation session

22  yet.  That was just scheduled for April 26, 27 and 28.  We have

23  had one conversation with the mediator since he's been

24  appointed, and we have addressed these issues to him to let him

25  know, to set his expectations about what our problems are.

M4E3ROMC

1        THE COURT:  Got it.

2        So here's my view on the mediation.  Again, if you can

3    settle in mediation, a global settlement, I will be thrilled.

4    If you can't, I don't see the mediation, the bankruptcy

5    mediation as being an alternative location to this litigation.

6    It may happen it will resolve it.  They haven't agreed to

7    mediate this dispute.  So, to me, the mediation is kind of

8    neither here nor there, other than I hope it is successful.

9        That brings us to the issue of the policies.  I read

10   your letter to say you have both given each other everything

11   you actually have on the policy that Arrowood, they were Royal

12   policies that were written from '57 to '76.  And there are

13   gaps.  Is that a fair statement?

14       MR. LAW:  Yes, your Honor.  That's correct.  There are

15   some policies that have more documentation to them than others.

16   Some are more complete than others.  And the parties have

17   already exchanged what they have.  Arrowood really didn't have

18   anything that we didn't already have.  So the one thing we

19   mentioned in our letter are the Royal forms that Arrowood may

20   have in its possession.

21       THE COURT:  Mr. Smith, do you object to giving over

22   the old Royal forms?

23       MR. SMITH:  I am not sure which forms they're

24   referring to or whether such forms exist.  The first time I got

25   that was in a letter.  I'm not opposed to providing them with

M4E3ROMC

1  discovery.

2           THE COURT:  What do you want from them?

3           MR. SMITH:  They say they've given us everything.  I

4  would like the certification as to what the search was

5  conducted that they do have everything.  Because again, we've

6  received conflicting information from them on what actually

7  they do and don't have.  Most importantly, though, I want

8  interrogatories to say if this is everything and we all

9  recognize this is not enough, even what the limits of the

10 policy are, then tell me what your position -- that's why I

11 want to serve interrogatories -- tell me what you believe to be

12 the terms and conditions of policy X, what the limits are, and

13 tell me what your basis is for that position so I can see.  I

14 have no idea if I agree with it, disagree with it.  Right now I

15 don't know.

16           THE COURT:  Okay.

17           MR. SMITH:  They've said they've given me all the

18 documents.

19           THE COURT:  Mr. Law, what's your objection to

20 providing that information?  It seems to me like

21 interrogatories might be the most efficient way of doing that.

22           MR. LAW:  Your Honor, my only point on that was that

23 asking us what's in a written document doesn't make a lot of

24 sense.  If we are going to be getting Royal forms and they are

25 asking us do you consider parts of these Royal forms to be

M4E3ROMC

1    within the policy, that might be something.

2              THE COURT:  Right now, you have a position on what the

3    policy limits are and what the provisions of the policies are.

4    You are the plaintiff.

5              MR. LAW:  Yes.

6              THE COURT:  So, what I hear the defendant saying is

7    they just want to know what the basis of those claims are.  And

8    you are saying you need to see the Royal forms before you can

9    give them the basis for that information?

10             MR. LAW:  Well, your Honor, based on the policy

11   information that we've provided them, I think that information

12   is in there.  The Royal forms might inform certain of the terms

13   and conditions of the policies, so we want to see those before

14   we answered interrogatories, if interrogatories were going to

15   be allowed.

16             I think the better way to do it would be to have

17   policy documents and try to reach some sort of a stipulation as

18   to what the policy documents are as opposed to interrogatories.

19             THE COURT:  That's great.  Mr. Law, I'm all in favor

20   of stipulations.  But based on my experience in this case, to

21   date, you guys could not stipulate that the sun rises in the

22   east.  So, I don't hold out a lot of hope that if I send you

23   off to say do this informally, figure out what the policy

24   limits are and what the provisions are, that you'll do anything

25   other than come back to me in three months in the same position

M4E3ROMC

1    you are right now.

2          So, I'm prepared to order discovery on that.  The

3    question is, how long do you need?  This is discovery solely on

4    the issue of the basis for the Diocese's position on policy

5    limits and terms, and the defendant's production of, they've

6    produced everything they've got actually on these insurance

7    policies, but any Royal forms that might be relevant.

8          MR. SMITH:  If the question was posed to me, we can

9    serve our discovery requests in that regard within two weeks.

10          THE COURT:  All right.  Is that a fair time frame as

11    well for you, Mr. Law?

12          MR. LAW:  Yes, your Honor.

13          THE COURT:  So you're both going to serve discovery

14    demands relative to what is in the policies by April 28.

15          Do you think you will both be able to respond to those

16    within 30 days?

17          MR. SMITH:  From Arrowood's perspective, depending on

18    the scope of what they're asking for, I believe that should be

19    sufficient.  If I need an extra 15 days, I'm sure we can agree

20    on those types of issues.  But I think 30 days is a fair number

21    to start with.

22          THE COURT:  Mr. Law, do you think that's fair?

23          MR. LAW:  That should be fine for us to produce the

24    policy documentation we have and to ask -- respond to whatever

25    interrogatory requests, as long as they're reasonable in

M4E3ROMC

1    number.  Again, I don't envision a problem there.

2              THE COURT:  Okay.  So be it.

3              So that brings us to the issue of discovery relative

4    to timely notice, known loss defenses, and failure to

5    cooperate.

6              So to reiterate what I've said in the opinion, I'm

7    sympathetic to the church, to the Diocese on the issue of an

8    insured should not have to litigate a two-front war.  They

9    shouldn't have to fight with the plaintiffs at the same time

10   they're fighting with their insurance company.

11             That said, that doesn't mean there should be no

12   discovery.  The insurance carrier has a good faith basis in my

13   view, probably more than that, sort of a reasonable argument

14   that some of these defenses might actually come to pass as to

15   at least some claims.  So they're entitled to some discovery.

16   So the issue is how do we get from where you are right now,

17   which is really Arrowood, you are trying to use this as a

18   backdoor to fight them on everything.  Or at least you haven't

19   sort of described to me what your targeted discovery is that

20   would keep that from happening.

21             So I feel like this is a little bit like trying to

22   nail Jello.  Y'all don't have an actually sharp dispute yet

23   because discovery hasn't been served.  Right?

24             Correct, you have not served discovery on this topic?

25             MR. SMITH:  That's correct, your Honor.

M4E3ROMC

1          THE COURT:  Let's give you a date to serve discovery.

2     That would be discovery that would relate to those three

3     defenses.  The Diocese then can decide whether to respond or to

4     object to all of it.  My hope would be that the insurance

5     carrier would propose reasonable discovery, understanding that

6     you cannot use this as a backdoor to full discovery on whether

7     you ultimately have a duty to indemnify.  And that the Diocese

8     will be reasonable, because you do have an obligation to

9     provide some discovery.  So that we can figure out what's going

10    on here, whether they actually do have a defense to their

11    obligation to defend.  So, but it's too mushy to me at this

12    point.

13         Assuming there is objections, and you do not get

14    everything you need, then you are going to have to make a

15    motion to compel.  And the reason I want to set it up that way

16    is in the limited research I've done on this topic, it is not a

17    clearcut issue, and you are going to be kind of in between some

18    cases.  So I want you to do good legal work on this, on

19    precisely how New York courts have drawn these lines, and you

20    may have to go outside of New York.  I don't know.

21         So, let's talk about a time frame for that.  You could

22    do this all as part of one set of discovery demands.  I think

23    there could be some utility to making them separate discovery

24    demands.

25         MR. SMITH:  That's what I was going to suggest.  Get

M4E3ROMC

1    the policy issues, get those done in two weeks.

2              THE COURT:  Do you need that discovery before you

3    propound your discovery on your defenses?

4              MR. SMITH:  No, I don't think we do.  We can propound

5    discovery without waiting for their responses there.  But I

6    would ask for more than two weeks.

7              THE COURT:  Of course.

8              MR. SMITH:  We'd probably ask for 30 days from today.

9    I think would be more than enough time.  I want to make sure we

10   tailor them in accordance with your Honor's instructions today.

11   I think 30 days would be more than sufficient for us to serve

12   that discovery.

13             THE COURT:  Okay.  That would take you to let's say

14   May 13.  And then I'll give you 30 days to respond.  Is that

15   fair?

16             MR. LAW:  Yes, your Honor.

17             THE COURT:  So the plaintiff's response to those will

18   be due on June 17.  That may be a little more than that.

19             MR. LAW:  Your Honor, to the extent we decided to do

20   discovery on these issues as well, it is a two-way street,

21   right?

22             THE COURT:  Of course.  I don't know what they have

23   that's going to help you.  But if you want to propound

24   discovery on these topics, go for it.

25             MR. LAW:  Yes, your Honor.  The main thing would be

M4E3ROMC

1   trying to figure out what claims, identifying the claims they

2   actually have some good faith basis for raising, say a late

3   notice defense or something like that.

4            THE COURT:  Okay.  So that brings us to -- so, what

5   I'm going to do then is set up a conference.  So your responses

6   will be due on the 17th of June.  I'm not sure we need a

7   conference.  I think, what, how long do you think you'll need

8   to assess whether you want to make a motion to compel?  It kind

9   of depends what you get.

10           MR. SMITH:  I am thinking about the time frame, end of

11  June.  We are going to need a few weeks probably, it will

12  depend on the volume of stuff, maybe it would be best for us to

13  send you a letter within two or three week of receipt and tell

14  you where we are.  Does that make sense?

15           THE COURT:  That makes sense.  Here's what you need to

16  do.  By let's say July 8, before July 8, the parties need to

17  meet and confer, and if there is going to be a motion to

18  compel, you need to meet and confer and propose a briefing

19  schedule.  Again, don't treat this like a standard five-page

20  discovery dispute.  I want a full sort of brief on a motion to

21  compel and a full response on a motion to compel.  I'm telling

22  you now, I see some difficult legal issues, so I want good

23  briefing on this.  So, propose a briefing schedule on July 8.

24           MR. SMITH:  Sure.

25           THE COURT:  On those issues.

M4E3ROMC

1      That brings us to the issue of the counterclaim

2   regarding Father Romano and other priests that is the

3   applicability of the expected or intended exclusion.  I think

4   what they want first, they need Arrowood to identify the

5   underlying complaints that are covered by counterclaim number

6   two.

7      MR. SMITH:  Your Honor, I would think that these

8   issues can all get melded right into the same discovery

9   schedule we just addressed.  If there are certain questions

10   they want answered as it relates to our counterclaim basis

11   number two, just like we are trying to pursue the other

12   defenses, they can serve the discovery on that same time frame,

13   we'll respond to it.

14      THE COURT:  Does that work from your perspective,

15   Mr. Law?  Is there any reason you need that in advance?

16      MR. LAW:  I think that makes sense to meld that

17   together.

18      THE COURT:  So that will be all part and parcel then

19   of the discovery demands that are made on May 13.  That gives

20   you an actual basis for reciprocal discovery or for other

21   demands at that point.

22      Then we get to the issue of the defense costs.  This

23   is what's been incurred so far and the reasonableness of Jones

24   Day's fees.

25      So, Mr. Law, you seem to be arguing these costs are

M4E3ROMC

1   just not all that high and why is Arrowood being so difficult

2   about this.  Is that a fair assessment of the net of your

3   argument?

4               MR. LAW:  That's part of it, your Honor.

5               THE COURT:  That of course cuts both ways.

6               MR. LAW:  Yes.  So, that is only one part of it.  So,

7   my thoughts on this are that there are a couple of millions of

8   dollars in legal fees probably in dispute for the --

9               THE COURT:  Couple of millions?

10              MR. LAW:  Couple of million, yeah, overall.  The

11  defense of each individual action is individually small.  For

12  each individual actions, it is 100 or less.  Some are under

13  $10,000 for the pre-petition defense clients.

14              THE COURT:  It reminds me of that old a dollar here, a

15  dollar here, and all of a sudden you are talking billions.

16              MR. LAW:  Exactly.  On the claims where -- let's step

17  back.

18              So they haven't disclaimed coverage for any of these

19  cases.  They are saying that they are defending under a

20  reservation of rights.  They've disclaimed for four cases.

21  Your Honor declared they had a duty to defend those four cases.

22  They should pay the amount of defense costs that they find to

23  be reasonable.  And then we fight over the portion that is

24  unreasonable through discovery and in a normal practice, if we

25  are not able to settle.

M4E3ROMC

1          THE COURT:  But also in that bucket of costs, am I not

2     correct is also the defense costs for fees where they've

3     already paid some of it.  But they are just disputing, there is

4     a delta that they dispute is not reasonable.

5          MR. LAW:  Yes.  So the delta that they dispute is a

6     couple of million dollars over all.

7          THE COURT:  Then there is the four claims.  How much,

8     what's the total defense costs?

9          MR. LAW:  Something like 126,000.  We've put it in the

10    letter.  So, of that 126, they might pay 30 or 40, then we

11    would fight over the remainder.

12         THE COURT:  Okay.  So, let me say that I'm sort of two

13    minds on this.  On the one hand, the larger resolution of some

14    of Arrowood's arguments may mean that they don't owe any of

15    this and that you in fact owe them.  So there is a side of me

16    that wants to say, look, just hold off on this until the larger

17    issues get decided and get resolved as part of this.

18          The other side of me says this is not a lot of money,

19    and taking extensive discovery on the reasonableness of Jones

20    Day's fees makes, in my humble opinion, no sense.

21          I'm happy to send you to a settlement conference for

22    it with a magistrate judge.  The magistrate judges in this

23    district are well aware of what reasonable dollar rates for

24    lawyers in this area defending essentially tort claims.  Tort

25    claims with twists, but they're still tort claims.  So that

M4E3ROMC

1      would be one way of resolving this issue.  Let's clean out the

2      underbrush of some of this money, recognizing that if Arrowood

3      wins on the larger issues you will have to pay it back.  So I

4      am of two minds.

5              MR. SMITH:  Your Honor, if I could be heard.

6              THE COURT:  Yes.

7              MR. SMITH:  The less than $100,000 that's at issue

8      with these four claims is really the tail wagging the dog on

9      this thing, as Mr. Law acknowledged.  Their claims for defense

10     costs are in the millions.  We don't know what the number is.

11     What are you actually claiming you are entitled to in defense

12     costs.  They filed a motion for summary judgment on that very

13     issue.  And we even, in that motion practice, we never got the

14     final number what is it you guys are saying you are owed.

15             To your point, we had defenses that while your Honor's

16     ruled on those four claims, as it relates to our expected

17     intended defenses, there are other defenses there.  For us to

18     engage in extra and duplicative and this piecemeal litigation

19     for these four claims to resolve a dispute over something less

20     than $100,000 that we may actually get back if we're successful

21     in our other defenses, doesn't make a lot of sense to us.  It

22     seems piecemeal, it seems inefficient, and at the end of the

23     day it is really not moving the needle one way or the other on

24     this litigation.  Which is why we said include the defense

25     costs within the whole panoply of discovery, we're very

M4E3ROMC

1       interested in what is their total claim.

2                 It doesn't make sense to piece these four out of the

3       bigger picture.

4                 MR. LAW:  On the bigger issue, your Honor, a

5       settlement conference with a magistrate judge I think is a

6       reasonable way to try to resolve it.

7                 THE COURT:  No, not on the bigger issue.  He is not

8       proposing.

9                 MR. LAW:  On the 2 million in defense costs.

10                THE COURT:  He was not proposing that.  He was saying

11      this is, in the scheme of things, put this to one side, let's

12      resolve the bigger issues, and this will then sort of fall

13      away.  It is either going to fall away because they have a

14      defense or it's going to fall away because they don't have a

15      defense in which case they'll need to pay.  But at that point,

16      you are actually arguing over something that they really care

17      about, because it is really money to them.  Right now they're

18      still holding out hope they're not going to be responsible for

19      any of this.

20                MR. LAW:  Yes, your Honor.  I understand that.  So, my

21      view of it is that if they are going to maintain their

22      disclaimer for those four cases, despite your Honor's ruling it

23      will be based on these other defenses, they have not maintained

24      a disclaimer for any of the other cases which they've agreed to

25      defend under a reservation of rights.  And the amount of those

1    defense costs, I agree, having a lot of discovery about that

2    probably is an inefficient use of resources.  And if we can

3    reach agreement on a reasonable Jones Day rate on the

4    reasonable expense costs that were incurred pre-petition is a

5    reasonable thing and can bring money into the estate.

6         THE COURT:  It won't bring enough money into the

7    estate to make a difference.  You are looking for hundreds of

8    millions of dollars, not $100,000 for a claim.  Again, I

9    realize, a dollar here, a dollar there, you are talking about

10   real money.  But, I am just inclined to say this is just such

11   a -- this is really the tail wagging the dog.  And so, I'm

12   inclined to put that to one side for the moment.  You don't

13   particularly want to make discovery of all of your defense

14   costs and what you paid to Jones Day, right?

15        MR. LAW:  Your Honor --

16        THE COURT:  That's not one of the things you are

17   particularly looking to do.

18        MR. LAW:  The bigger issue would be the expert

19   discovery, I think which would be an expense.  We are not

20   anxious to do all of that discovery.

21        THE COURT:  I think expert --

22        MR. LAW:  We're anxious to reach a resolution of it.

23        THE COURT:  I think expert discovery on the

24   reasonableness of Jones Day's fees would be a waste of money.

25        MR. LAW:  I agree.

M4E3ROMC

1      THE COURT:  The judges in this district are well aware

2  of what are reasonable fees.  Whether Jones Day's fees are

3  reasonable or not remains to be seen.  As I recall, the rates

4  were eye popping.

5      MR. SMITH:  Yes, they were, your Honor.  The only

6  question I'd have, in light of your comments as it relates to

7  the global defense costs, like I said, we were hit with a

8  motion seeking a judgment on it.  Are we taking discovery at

9  least on the global number and what the basis is for it and the

10  documents related to that or are you telling us to put it in

11  abeyance and not to look at it?

12      THE COURT:  I am telling you to put it in abeyance.

13      MR. SMITH:  I want to make sure we are not hit with a

14  motion.  We want to understand it's both sides.

15      THE COURT:  I want to put that entirely on hold and

16  resolve the bigger issues, the bigger points of dispute between

17  the parties, because this issue, I think if everything else is

18  resolved, can be settled, because it's just not that much

19  money.  In the scheme of things, it is not that much money.

20  And I think you will be able to settle it if everything else is

21  resolved.  Or if not, it can be decided and it's not going to

22  be a huge lift to decide that issue.

23      That brings us to the issue of which underlying claims

24  are actually at issue in this -- I removed the proceeding that

25  you brought, so what is at issue?  Do you want in this lawsuit

M4E3ROMC

1    the issue of Arrowood's obligation to defend claims that have

2    been filed in the bankruptcy?

3         MR. LAW:  Yes, your Honor.  I think it would be wise

4    for us to amend our complaint now that we've got an action

5    that's solely against Arrowood in this case.  And now that your

6    Honor has said some of the way in which we structured our

7    requests for relief really were calling for advisory opinions,

8    I think it would be wise for us to amend the complaint.  Put at

9    issue squarely the issue of post-petition defense costs of the

10   claims in bankruptcy, in addition to the pre-petition defense

11   costs, which is what we initially brought our action about.

12        THE COURT:  Is there any objection to them amending

13   the complaint to make it clear what they are actually claiming?

14        MR. SMITH:  Your Honor, Mr. Law raised this with me I

15   think it was yesterday or the day before about amending his

16   complaint, and I said provide me a proposed pleading, and I

17   would be happy to look at it.  I'm not going to waste time on a

18   motion for leave that's unnecessary, but I wanted to see

19   exactly what it was they were going to allege.

20        THE COURT:  Okay.  So, how long will it take you to

21   provide your opponent with a proposed amended complaint?

22        MR. LAW:  May I have two weeks, your Honor?

23        THE COURT:  Yes.  So the amended complaint is due to

24   your opponent on the 27th.  And then if there is a dispute, you

25   need to let me know by the following week, which would be

M4E3ROMC

1    May 4.

2            MR. SMITH:  Your Honor, can we get a couple more days

3    only because the mediation is right in the middle of that and

4    we could be both be distracted, and I will need time to talk to

5    my client.

6            THE COURT:  Okay.

7            MR. LAW:  Mr. Smith makes a wonderful point that we

8    should be talking about three weeks for all of our deadlines

9    when we have been saying two weeks.  This lands right in the

10   middle of this mediation session.

11           MR. SMITH:  I want to make sure that wonderful point

12   got on the record.

13           THE COURT:  Call The New York Times.  It was on

14   April 14.

15           So, let's adjust these time frames then.  So, you are

16   going to serve discovery demands relating to the policy and the

17   terms of the policy, when -- the mediation is the 27, 28, 29.

18           MR. SMITH:  26, 27, 28.

19           THE COURT:  Let's go over to the following week.  So

20   your discovery requests are due on May 6.  Again, the response

21   will be due in 30 days.  The discovery demand for the defenses

22   will be due on May 20.  Responses will be due June 24.  So the

23   motion to compel, you need to meet and confer and give me a

24   schedule on a proposed motion to compel by July 15.  So the

25   draft amended complaint needs to be given to Arrowood by May 4.

M4E3ROMC

```
 1   And Arrowood, you need to let me know whether you object to it
 2   by May 10.
 3              Okay?  That's everything on my list of issues.  I
 4   believe.  Yes.  Anything on your list of issues, Mr. Law?
 5              MR. BERRINGER:  Your Honor, just one for purpose of
 6   clarity just one point.
 7              THE COURT:  Sure.
 8              MR. BERRINGER:  There has been a lot of back and forth
 9   about Arrowood's ostensible right to recoup defense costs.
10   Under New York law, I just feel constrained to point out our
11   position under New York law, which is that they have no right
12   to reimbursement.
13              THE COURT:  That's even more reason to stay that
14   issue.
15              MR. BERRINGER:  Okay.
16              THE COURT:  If you're right.
17              MR. BERRINGER:  I just felt constrained to get that on
18   the record.
19              THE COURT:  I had forgotten that was a point of
20   controversy.  And in truth, I was just assuming that of course
21   there is a right to recoup.
22              MR. BERRINGER:  Not unless they put it in the
23   policies.
24              THE COURT:  That would be the policy no one has.  I am
25   going to assure you they'll tell you that was a standard term
```

M4E3ROMC

1      in all the policies.

2              MR. BERRINGER:  They would be misrepresenting their

3      policies.  Back in those days, no one had that in their

4      policies.

5              THE COURT:  Back in those days people didn't charge

6      $1,000 an hour to defend a tort claim.

7              MR. BERRINGER:  I wish I could get a thousand an hour.

8              THE COURT:  Okay.

9              Anything on your agenda, Mr. Smith, that I haven't

10     covered?

11             MR. SMITH:  No, thank you, your Honor.

12             THE COURT:  How about the unsecured creditors?

13             MR. BAIR:  No, your Honor.

14             THE COURT:  Good luck in the mediation, everybody.

15     Maybe the mediator can hold the Dioceses and shake out some

16     documents so y'all can get what you need and you can resolve

17     this case and we can all go on with our lives.

18             Thank you, all.  Good luck.

19             MR. SMITH:  Thank you, your Honor.

20             (Adjourned)

21

22

23

24

25