UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,

                Plaintiff,

      -against-

ARROWOOD INDEMNITY COMPANY,
f/k/a Royal Insurance Company, f/k/a Royal
Globe Insurance Company,

                Defendant.

Case No. 1:20-cv-11011 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

        Plaintiff, the Roman Catholic Diocese of Rockville Centre, New York (the "Diocese"), brings this action against Arrowood Indemnity Company ("Arrowood") alleging breach of contract and seeking a declaratory judgment as to the scope of the insurance company's duty to defend and indemnify the Diocese in underlying actions alleging child sexual abuse by clergymen in the Diocese. *See* ECF No. 51. Though the claims were initially brought in an adversary proceeding in the U.S. Bankruptcy Court for the Southern District of New York, on May 17, 2021, this Court granted Arrowood's motion to withdraw the bankruptcy reference as to the Diocese's claims against Arrowood. ECF No. 42. The Court subsequently issued an opinion granting in part and denying in part the Diocese's motion for partial judgment on the pleadings, as well as Arrowood's motion to amend its answer to include counterclaims seeking, among other things, a declaratory judgment that it does not have a duty to defend the underlying sexual abuse claims. ECF No. 84. Now before the Court is Arrowood's motion to compel discovery related to its duty to defend. ECF No. 105. For the reasons set forth below, Arrowood's motion is GRANTED in part and DENIED in part.

**BACKGROUND**

The following facts are taken from the Diocese's Amended Complaint, ECF No. 98 ("Am. Compl."), Arrowood's Answer and Counterclaim with respect to the Amended Complaint, ECF No. 101 ("Ans. & Counterclaim"), the Court's February 23, 2022 Opinion, ECF No. 84 ( "Feb. Op."), and the papers filed with respect to the instant dispute.[1]  On February 14, 2019, the State of New York enacted the Child Victims Act ("CVA"), which expanded the statute of limitations for claimants to sue parties whose actions or omissions facilitated the sexual abuse of children.  Am. Compl. ¶ 2; Feb. Op. at 2.  Pursuant to the CVA, hundreds of victims have sued the Diocese and related entities for negligence related to the acts of sexual abuse allegedly committed by clergymen working for the Diocese.  Am. Compl. ¶ 3; Feb. Op. at 2.  The Diocese has identified insurance policies that it asserts were in effect when the alleged abuse occurred and is relying on those policies to defend the myriad of sexual abuse claims brought against it.  Feb. Op. at 2.  Arrowood is the successor-in-interest to several insurance companies who entered into the policy agreements with the Diocese and insured the Diocese from October 1957 to October 1976 (the "policy period").  Am. Compl. ¶ 6; Ans. & Counterclaim at 2-4, ¶¶ 6, 10-12.[2]  The Diocese tendered approximately 286 CVA lawsuits to Arrowood, including 129 pre-petition suits and 157 post-petition suits for defense

---

[1] The relevant papers include Arrowood's Memorandum in Support of its Motion to Compel, ECF No. 106 ("Br.") and supporting declaration, the Diocese's Memorandum in Opposition to the Motion to Compel, ECF No. 112 ("Opp. Br.") and supporting declaration, and Arrowood's Reply Memorandum in Support of its Motion to Compel, ECF No. 118 ("Reply"), and supporting declaration.  The Court also considers the arguments made by the parties at the November 29, 2022 oral argument.  *See* Nov. 29, 2022 Transcript ("Nov. Tr.").

[2] For purposes of this Opinion, references to "Arrowood" also refer to its predecessors-in-interest. The policies during that time will be collectively referred to as the "Arrowood Policies" and the aforementioned date range as the Arrowood "policy period."  Ans. & Counterclaim at 3-4, ¶ 12.

and indemnity pursuant to the policies in effect at the relevant times.  Br. at 2 n.1.  Arrowood

agreed to defend most of the pre-petition suits, subject to a reservation of rights.  Br. at 2.

Given the extraordinary number of claims filed against the Diocese after the CVA

went into effect, the Diocese filed for Chapter 11 bankruptcy on October 1, 2020, which

stayed the litigation against the Diocese.  *See* Petition, 20-bk-12345, ECF No. 1.  The Diocese

filed an adversary proceeding against numerous insurance companies to resolve coverage

disputes; as to Arrowood, it sought declaratory judgments that Arrowood had duties to defend

and indemnify the Diocese under the relevant policies.  *See* Complaint, 20-ap-01227, ECF No.

1 ¶¶ 82-87.[3]  The Diocese also alleged that Arrowood breached the insurance contracts by not

providing a defense.  *Id.* ¶¶ 88-97.  The Diocese seeks defense and indemnity from Arrowood

for all of the lawsuits filed under the CVA as well as for over 400 Proofs of Claim ("POC")

filed in the bankruptcy that allege sexual abuse during the policy periods of the Arrowood

policies (collectively, the "Underlying Actions").  Br. at 2; Am. Compl. ¶¶ 62-79.  Arrowood

has denied coverage for all post-petition claims.  Am. Compl. ¶ 62.

On December 29, 2020, Arrowood moved in this Court to withdraw the reference to

the Bankruptcy Court.  ECF No. 1.  On May 17, 2021, this Court granted that motion,

bringing the Diocese's claims against Arrowood before this Court.  ECF No. 42.  The parties

subsequently filed a Complaint, ECF No. 51, and Answer, ECF No. 53.  On June 16, 2021,

the Diocese moved for, among other things, partial judgment on the pleadings, contending

that Arrowood has a duty to defend all of the Underlying Actions when the claims are at least

potentially covered, that Arrowood has a duty to defend and indemnify four of the Underlying

---

[3] At oral argument, counsel for Arrowood represented that it is the only insurance company currently in coverage litigation with the Diocese whose policies provide for a duty to defend.  Nov. Tr. 59:16-22.

Actions that Arrowood was refusing to defend, and for a stay with regard to the issue of Arrowood's duty to indemnify.  ECF No. 55.  On June 25, 2021, Arrowood moved for leave to file an amended answer, and to assert counterclaims for, among other things, a declaratory judgment that it does not have a duty to defend the Underlying Actions.  ECF No. 65.

On February 23, 2022, the Court granted both parties' motions, in part.  Specifically, the Court granted judgment on the pleadings to the Diocese with respect Arrowood's duty to defend four Underlying Actions – the *G.C.*, *Kelly*, *B.R.* and *F.C.* lawsuits.  Feb. Op. at 11. Those lawsuits allege sexual abuse by Romano Ferraro, a priest in the New York area during the policy period.  *Id.* at 6.  The suits allege that Ferraro was a known sexual predator, who was dishonorably discharged from the Navy in 1970, and subsequently transferred between Dioceses when allegations of abuse percolated.  *See, e.g.*, ECF No. 57, Ex. D, *G.C. v. Diocese of Rockville Centre, et al.*, Index No. 900035/2019, Compl. ¶¶ 16-53 (alleging negligence with respect to abuse by Romano of plaintiff altar boy in 1975 and 1976); *see* Feb. Op. at 6-11; ECF No. 57, Exs. E, F, G.  Without discovery, and based on the four underlying complaints, the Court granted judgment on the pleadings, holding that Arrowood has a duty to defend those lawsuits.  Feb. Op. at 11.  The Court stated that:

> [t]he allegations in the complaints do not provide sufficient detail about who in the Diocese of Rockville Centre knew what when and whether individuals within the Diocese of Brooklyn communicated what they knew to their colleagues in the Diocese of Rockville Centre such that the only permissible conclusion is that the sexual abuse had to have been intended or expected by the Diocese of Rockville Centre.

*Id.*  Deeming it a "close call," the Court reasoned that while the allegations in the four underlying complaints "involve conduct and knowledge that occurred either prior to or concurrently with the abuse alleged in the four complaints," the Court cannot conclude that there is "no possible factual or legal basis on which" Arrowood may be held to eventually

4

indemnify the Diocese.  *Id.* at 10-11.  Given the broad scope of the duty to defend, the Court

held that Arrowood must defend those four actions.  *Id.* at 11.

The Court did not, however, determine whether Arrowood has a duty to defend the

other Underlying Actions, many of which Arrowood agreed to defend with a reservation of

rights.  *See Golden Ins. Co. v. Ingrid House, Inc.*, 538 F. Supp. 3d 293, 308 (S.D.N.Y. 2021)

("An insurer can both disclaim coverage and provide a defense pursuant to a reservation of

rights.").  Other Underlying Actions allege similar facts with respect to different clergymen.[4]

For instance, one complaint alleges negligence against the Diocese with respect to Charles

Ribaudo, a priest employed at Holy Trinity Catholic High School, who sexually abused a

young parishioner from 1971 to 1975, allegedly taking him to his apartment on the campus in

the presence of other priests and employees.  *See Koeneke v. Holy Fam. Roman Cath. Church,*

*et al.,* Index No. 900004/2019, Compl. ¶¶ 15-26 (N.Y. Sup. Ct. Aug. 14, 2019).  Another

complaint alleges that the Diocese knew or should have known that Monsignors Edward

Melton and Patrick Quigley sexually abused minors and still put them in direct contact with

the minor plaintiff.  *See Mills v. Roman Cath. Diocese of Rockville Centre, et al.*, Index No.

900040/2019, Compl. ¶¶ 50-52, 62-72 (N.Y. Sup. Ct. Sept. 16, 2019) (alleging negligence

with respect to abuse by Melton, Quigley, and one other employee in 1976); *see also, e.g.*,

*Silvestre v. The Roman Cath. Diocese of Rockville Centre, et al.*, Index No. 900054/2019,

Compl. ¶¶ 7-21 (N.Y. Sup. Ct. Oct. 22, 2019) (alleging negligence with respect to sexual

abuse by Monsignor Melton and others of a child in the late 1960s and early 1970s).  Yet

another complaint alleges that the Diocese knew or should have known about Monsignor Alan

---

[4] Approximately 20 complaints in the Underlying Actions are incorporated by reference into
Arrowood's Answer and Counterclaim.  *See generally* Ans. & Counterclaims at 33-59, ¶¶ 79-207.
They are publicly available via Index Number on https://iapps.courts.state.ny.us/webcivil/FCASMain.

Placa's prior abuse of children and/or his propensity to abuse children. *See Fernan v. Diocese of Rockville Centre, et al.*, Index No. 900037/2019, Compl. ¶ 4 (N.Y. Sup. Ct. Aug. 23, 2019) (alleging negligence with respect to sexual abuse by Placa of a child from 1974 to 1977).

The Court permitted Arrowood to amend its answer and assert counterclaims seeking a declaratory judgment that it does not have duties to defend and indemnify based on certain coverage exclusions. Feb. Op. at 30.[5] Finally, the Court stayed the action with respect to Arrowood's duty to indemnify the Diocese until after the Underlying Actions have been resolved. Feb. Op. at 23.

On April 14, 2022, the Court held a conference to address, among other things, disputes about the scope of discovery related to the present action. The Court ultimately granted discovery regarding insurance policies and forms. *See* ECF No. 99 ("April Tr.") at 11:3-7. With respect to Arrowood's discovery related to exclusions such as late notice, known loss, and cooperation, the Court indicated that it was sympathetic to the notion that "an insured should not have to litigate a two-front war" in the Underlying Actions and the instant coverage action, but also acknowledged that some discovery may be warranted. *Id.* at 12:8-15. However, the Court held that the issue was not ripe for review because no discovery demands had been made yet. *Id.* at 12:16-23. The Court ordered Arrowood to serve "reasonable discovery" that is not a "backdoor to full discovery on whether [Arrowood] ultimately [has] a duty to indemnify" since that claim has been stayed, and the Diocese could "decide whether to respond or to object to all of it." *Id.* at 13:4-9. If a dispute arose, the

---

[5] The Court later permitted the Diocese to amend its complaint once more, and both parties subsequently filed amended pleadings that now govern this action. *See generally* Am. Compl.; Ans. and Counterclaims.

parties were instructed to notify the Court and file a motion to compel with full comprehensive briefing. *Id.* at 13:13-20.

Arrowood served expansive discovery requests seeking broad categories of information, and the Diocese filed nearly wholesale objections to those requests. Unsurprisingly, the parties were unable to resolve their discovery disputes. On August 26, 2022, Arrowood filed its motion to compel discovery related to its counterclaims and coverage defenses. *See* ECF Nos. 104-107. On September 27, 2022, the case was reassigned to the undersigned. ECF No. 110. On September 30, 2022, the Diocese filed its brief in opposition. *See* ECF Nos. 112-113. On October 19, 2022, Arrowood filed its reply papers. ECF Nos. 118-120. On November 29, 2022, the Court heard oral argument on the dispute. *See* Nov. Tr.

## LEGAL STANDARD

The scope of discovery is governed by Federal Rule of Civil Procedure 26(b)(1), which permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). The Rule further directs courts, in deciding whether discovery is proportional to the needs of the case, to consider the "importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Additionally, "the court must limit the frequency or extent of discovery otherwise allowed . . . if . . . (i) the discovery sought is unreasonably cumulative or duplicative . . . (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). A

district court has broad discretion to determine the scope of discovery.  *See, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery.").

## DISCUSSION

### I.      The Duty to Defend

Because the question of whether Arrowood has a duty to indemnify the claims has been stayed, *see* Feb. Op. at 23, all of Arrowood's discovery requests must be examined in the context of the duty to defend claims and related counterclaims.  To determine whether a request seeks relevant information, a brief overview of the law surrounding an insurer's duty to defend is instructive.

### A.  Scope of Insurer's Duty to Defend

Under New York law,[6] an insurer's duty to defend its policyholders in litigation is quite broad, and certainly broader than the insurer's duty to indemnify the policyholder.  *See Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006); *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 94 (2d Cir. 2018) ("The duty of an insurer to defend its insured is 'exceedingly broad' and far more expansive than the duty to indemnify its insured.") (internal citation omitted).  Given this, "an insurer will be called upon to provide a defense whenever the allegations of the complaint suggest . . . a reasonable possibility of coverage."  *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137 (internal citations and quotation marks omitted).  Therefore, "[i]f, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be . . . .

---

[6] Both parties agree that New York law applies to this dispute.  *See, e.g.*, Br. at 1; Opp. Br. at 1.

Thus, an insurer may be required to defend . . . even though it may not be required to pay once the litigation has run its course." *Id.* (internal citation and quotation marks omitted).

However, the insurer's duty to defend "will end if and when it is shown *unequivocally* that the damages alleged would not be covered by the policy." *Stein v. N. Assur. Co. of Am.,* 617 F. App'x 28, 30-31 (2d Cir. 2015) (emphasis added) (quoting *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 74 (1975)). "In other words, where an insurer's duty to defend turns on an unresolved factual dispute, 'the duty to defend lasts only until the factual ambiguity is resolved in favor of the insurer.'" *Id.* at 30-31 (quoting *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 622 (2d Cir. 2001)); *see also Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F. Supp. 1416, 1425 (S.D.N.Y.1991) (The "duty to defend continues until judicial determination, either in [the] underlying action or in [the] coverage action, of [the] issue relevant to coverage" (citing *Colon v. Aetna Life & Cas. Ins. Co.*, 66 N.Y.2d 6 (1985))).

An insurer can show that the "damages alleged would not be covered by the policy," by showing unequivocally that the allegations are subject to a policy exclusion. *See Sturges Mfg. Co.*, 37 N.Y.2d at 74. But:

> [t]o be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the heavy burden of demonstrating that the allegations of the [underlying] complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision.

*Gemini Ins. Co. v. Titan Constr. Servs., LLC*, No. 17-cv-8963, 2019 WL 4023719, at *6 (S.D.N.Y. Aug. 27, 2019) (internal citation omitted).

### B.  Four Corners Rule and Consideration of Extrinsic Evidence

A significant limiting factor in determining when and if an insurer's duty to defend is present or has ended is the "four corners rule."  Under that rule, an insurer's "duty remains even though facts outside the four corners of [the] pleadings indicate that the claim may be meritless or not covered."  *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137; *see Charter Oak Fire Ins. Co. v. New York Marine & Gen. Ins. Co.*, 559 F. Supp. 3d 244, 250 (S.D.N.Y. 2021) (same).  When "determining whether an insurer has a duty to defend," a court must "compare the allegations of the complaint with the operative insurance policy."  *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 148 (2d Cir. 2004).  Under this principle, "[i]f the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend."  *Charter Oak Fire Ins. Co.*, 559 F. Supp. 3d at 250 (internal citations and quotation marks omitted).  "Courts addressing the contours of the duty to defend thus ask what the complaint alleges, not what the objective state of reality is."  *City of New York v. Liberty Mut. Ins. Co.*, No. 15-cv-8220 (AJN), 2017 WL 4386363, at *7 (S.D.N.Y. Sept. 28, 2017).  The reason for this rule is that "[i]f an insurer could defeat its duty by proving, in a collateral action, the existence of a fact that *is* relevant to the merits of the underlying suit, it would follow that the insurer could subvert its obligation to defend against meritless suits."  *Id.* at *15 (emphasis in original).  This would be contrary to clear New York law that, as long as the complaint alleges facts within the insurer's coverage, the insurer must defend its insured "no matter how groundless, false or baseless the suit may be . . . ."  *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137 (internal citation and quotations omitted).

The Second Circuit has stated that "[a] narrow, but widely recognized exception to the ['four corners'] rule allows an insurer to refuse or withdraw a defense if evidence extrinsic to those sources and 'unrelated to the merits of plaintiff's action[,] plainly take the case outside

10

the policy coverage.'" *Int'l Bus. Machines Corp.*, 363 F.3d at 148 (quoting Allan D. Windt,

*Insurance Claims and Disputes*, § 4:4 at pp. 293-94 (West 2001) (citing cases)).  Despite this

acknowledgment, the Second Circuit has also noted that "the applicability of the extrinsic

evidence exception in New York is 'unclear.'" *Id.* at 148 n.4; *see also City of New York*, 2017

WL 4386363 at *12-13 (assuming *arguendo* that evidence extrinsic to the complaint could be

considered to prevent the attachment of a duty to defend or terminate it, but collecting cases to

demonstrate the lack of clarity in New York).

At this juncture, given the scope of Rule 26, the fact that the Second Circuit has noted

that the "extrinsic evidence exception" is "widely recognized" (if perhaps unclear), and the

many New York state and federal courts to have applied this exception, the Court will review

the instant motion to compel assuming the exception, in order to provide the broadest possible

basis in which to review the discovery sought by Arrowood.  *See Daval Steel Prods. v. M/V

Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) (holding that Fed. R. Civ. P. 26(b)(1) is a

"broad rule that is liberally construed" in order "to encompass any matter that bears on, or that

reasonably could lead to other matter that could bear on, any issue that is or may be in the

case" (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978))).

To the extent a court may consider evidence extrinsic to the complaint and the policies

when determining the scope of the duty to defend, the exception is very limited.  Courts have

considered extrinsic evidence only when it is unrelated to the merits of the underlying actions,

and conversely courts have refused to consider such evidence if it is related to the merits of

those underlying actions.  *See, e.g.*, *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302

F.3d 83, 96-97 (2d Cir. 2002) (affirming district court's grant of summary judgment on duty

to defend despite consideration of facts outside of the four corners of the complaint where

facts were based "on undisputed evidence, extrinsic to the complaints in the underlying

11

actions"); *Houston Cas. Co. v. Hudson Excess Ins. Co.*, No. 21-cv-3182 (JSR), 2021 WL
4555526, at *4 (S.D.N.Y. Oct. 4, 2021) ("More specifically, extrinsic evidence that goes
directly to the merits of the claims in the underlying action cannot be used to defeat the duty
to defend."); *City of New York*, 2017 WL 4386363, at *15 (refusing to consider extrinsic
evidence that goes to issues relevant to the merits of the underlying complaints); *Avondale
Indus., Inc.*, 774 F. Supp. at 1425 (holding that a court may consider extrinsic evidence to the
underlying complaint in a coverage action where it is collateral to the underlying action)
(collecting cases). Courts have also considered extrinsic evidence outside the four corners of
the complaint if the evidence is uncontroverted and does not address a disputed fact in the
underlying suit. *See, e.g.*, *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co*., 89 N.Y.2d
621, 635 (1997) (in reviewing the underlying complaint for purposes of a duty to defend, the
court may also look to "*judicial admissions* in the insured's responsive pleadings in the
underlying tort action or other formal submissions in the current or underlying litigation to
confirm or clarify the nature of the underlying claims") (emphasis added); *Philadelphia
Indem. Ins. Co. v. Streb, Inc.,* 487 F. Supp. 3d 174, 187 (S.D.N.Y. 2020) (finding no duty to
defend because policy excluded coverage for injuries while using a trampoline and it was an
undisputed fact in the underlying litigation that injury occurred on a trampoline); *Allstate Ins.
Co. v. Zuk*, 78 N.Y.2d 41, 45-47 (1991) (considering extrinsic evidence of undisputed final
criminal conviction for manslaughter in evaluating duty to defend wrongful death action);
*Allstate Ins. Co. v. Santiago*, 98 A.D.2d 608, 608 (1st Dep't 1983) ("[T]he policy in this State
has been to deny the declaratory judgment [regarding a duty to defend] where the matter in
dispute can be determined in the basic negligence action but to permit the [declaratory
judgment] action when the dispute is such that it depends on matters outside of the negligence

action or will not arise in the negligence action as a part of the lawsuit.") (quoting *Nationwide Mut. Ins. Co. v. Dennis*, 14 A.D.2d 188, 189 (1961)).

In addition, courts have ample discretion when deciding whether and what discovery into extrinsic evidence is permissible.  *See, e.g.*, *Westport Ins. Corp. v. Hamilton Wharton Grp. Inc.*, 483 F. App'x 599, 604 (2d Cir. 2012) (holding that district court did not abuse its discretion when it precluded insurer from conducting additional discovery into the duty to defend); *Burlington Ins. Co. v. Guma Const. Corp.*, 66 A.D.3d 622, 625 (2d Dep't 2009) (rejecting insurer's argument that trial court's determination that the insurer had a duty to defend was premature because discovery had not yet been completed because "[a]ny evidence that would be obtained through discovery would be irrelevant on this issue since even where there exist extrinsic facts suggesting that the claim may ultimately prove meritless or outside the policy's coverage, the insurer cannot avoid its commitment to provide a defense" (internal citations and quotation marks omitted)).[7]

It is within this legal framework that the Court examines Arrowood's motion to compel.[8]

## II.    Analysis

In support of its defense against, and counterclaims disavowing, its duty to defend, Arrowood is seeking broad discovery purportedly related to various policy exclusions, namely whether:  (1) the Diocese expected or intended any injuries suffered by a plaintiff/claimant,

---

[7] Even if discovery is permitted, the Court need not determine whether and how the Court will consider such evidence in the context of ultimately evaluating the duty to defend claims.

[8] Given the "four corners" rule for evaluating a duty to defend under New York law, the scope of discovery is necessarily very limited.  It is a separate matter as to whether Arrowood is entitled to significantly more discovery, if necessary, to evaluate its duty to indemnify when the stay is lifted.

and therefore there was no "occurrence" or "accident" within the meaning of the policy – the "expected or intended" exclusion; (2) the Diocese failed to disclose known incidents of priest misconduct when it applied for the Arrowood policies – the "known loss" exclusion; (3) the Diocese failed to timely notify Arrowood of the occurrences alleged in the Underlying Actions – the "late notice" exclusion; and (4) the Diocese has failed to cooperate with Arrowood in its investigation and defense of claims tendered to it – the "failure to cooperate" exclusion.  *See* Br. at 12-22.

Before examining the four exclusions, as a threshold matter, the Diocese has argued that the discovery sought is unnecessary because Arrowood has already been provided access to all of the nonprivileged information that it seeks in the context of the bankruptcy mediation. *See, e.g.*, Opp. Br. at 3-4; Nov. Tr. at 31:4-17.  Counsel for the Diocese provided a declaration stating that he is "not aware of any additional nonprivileged documents that have not already been provided to Arrowood in connection with the CVA Actions, the Diocese's bankruptcy, and the ongoing bankruptcy mediation, that are responsive to Arrowood's requests in this action."  ECF No. 113, Decl. of Eric P. Stephens in Opp. to Mot. to Compel ("Stephens Decl.") ¶ 22.  The Diocese's counsel goes on to state that "[t]o the extent Arrowood's motion to compel in this action were to be granted in whole or in part, documents already in Arrowood's possession from prior Diocesan productions would likely have to be reproduced, with redactions reapplied."  *Id.* at ¶ 21.  Counsel for Arrowood disputes these representations and challenges the prior productions as well as the privileged determinations made by the Diocese.  *See* ECF No. 120, Reply Decl. of Karen H. Moriarty in Support of Mot. to Compel ("Moriarty Decl.") ¶ 22.

The Court is unpersuaded by the Diocese's argument.  Not only does Arrowood dispute the Diocese's characterization of prior disclosures, which the Court has no way of

resolving given the confidentiality constraints of mediation settlement discussions, but the

Diocese filed this action.  Therefore, it created the so-called "two front war" of which it now

complains, and, having filed the action, the Diocese must comply with the Federal Rules of

Civil Procedure in adjudicating it.  In other words, the Diocese must provide, if appropriate

under Rule 26, discovery that can be used for purposes of assessing the legal obligations of

the parties with respect to Arrowood's duty to defend rather than pointing to the Diocese's

provision of confidential materials in a concurrent mediation.

   The Court now considers whether the discovery sought purportedly related to the

coverage exclusions is permissible.

### A.   "Expected or Intended" Exclusion and Known Loss Exclusion

   Arrowood first seeks information purportedly related to the exclusion in the policies

regarding the definition of "occurrence."  The Arrowood Policies require Arrowood to "pay

on behalf of the insured all sums which the insured shall become legally obligated to pay as

damages because of . . . bodily injury . . . caused by an occurrence" or, as articulated in some

of the policies, "caused by accident."  Br. at 13 & n.6 (quoting Arrowood Policies).  The

policies in effect from 1966 to 1976 "define occurrence to mean an accident . . . which results

. . . in bodily injury . . . neither expected nor intended from the standpoint of the insured."  *Id.*

Therefore, Arrowood claims that it is not obligated to defend (or indemnify) for injuries that

the Diocese "expected or intended."  *Id.* at 13-14.

   Along the same lines, Arrowood also seeks discovery allegedly related to the known

loss exclusion under the policy.  Under New York law, "[t]he 'known loss' defense is the

'insurance law principle that an insured may not obtain insurance to cover a loss that is known

before the policy takes effect.'"  *Sefcik v. State Farm Fire & Cas. Co.*, 169 F. Supp. 3d 350,

352 (E.D.N.Y. 2016) (quoting *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d

1178, 1214 (2d Cir. 1995), *modified on other grounds*, 85 F.3d 49 (2d Cir. 1996)).  Arrowood

argues that, if the Diocese "had knowledge of instances of sexual abuse prior to the inception

of the Arrowood Policies, there would be no duty to defend based on the known loss

doctrine."  Br. at 17.

      With respect to these exclusions, Arrowood seeks discovery into "[w]hen and how the

Diocese . . . first became aware of any allegations, claims or complaints of child sexual abuse

by a member of its clergy and/or other employee(s) or agent(s), including as regards [to]

specific abusers identified in the CVA Lawsuits and POCs."  *Id.* (citing various Interrogatory

Requests and Document Demands).  Arrowood also seeks discovery into any complaints

made to the Diocese, any investigations that occurred (including the Suffolk County Special

Grand Jury Investigation in 2002-2003, the 2004 John Jay Study, and the 2018 New York

Attorney General investigation), and any personnel files the Diocese kept for the employees

accused of abuse.  *Id.* at 17-18.  Arrowood further requests evidence regarding the Diocese's

policies and procedures for both training staff and determining whether claims should be

reported to the insurers.  *Id.* at 18.  Arrowood argues that these subjects are the proper target

of discovery because they are relevant to whether the Diocese knew of the losses when it

purchased its policies, or expected or intended the injuries suffered by child abuse survivors

such that the abuse could not be considered an occurrence for purposes of the duty to defend.

*Id.*

      The Diocese does not dispute the presence of these exclusions in the policies but

argues that the Diocese's knowledge and whether it expected or intended the injuries are "key

issues in each of the underlying claims" and therefore are not proper extrinsic evidence for

this Court to consider in evaluating a duty to defend.  Opp. Br. at 15.

The Court agrees and will not compel the broad discovery that Arrowood seeks with respect to the expected or intended or known loss exclusions at this time.  As set forth above, under New York law, Arrowood's duty to defend the Underlying Actions ought to be determined primarily by the allegations in (or four corners of) the underlying complaints and the insurance policies.  *See Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137; *see Charter Oak Fire Ins. Co.*, 559 F. Supp. 3d at 250.  This is why the Court previously granted Arrowood discovery as to the insurance policies and forms.  April Tr. at 11:2-7.

Even if the Court were to consider limited extrinsic evidence in evaluating the duty to defend, that evidence must be unrelated to the merits of the Underlying Actions or undisputed. *See supra* at 10-13.[9]  Generally speaking, the Underlying Actions concern negligence-based

---

[9] The cases that Arrowood cites in support of its request for full discovery into issues relevant to these coverage exclusions are not contrary to this rule and reinforce that the Court may only consider extrinsic evidence if it is unrelated to the underlying actions or undisputed.  *See, e.g.*, *Burt Rigid Box, Inc.*, 302 F.3d at 96-97 (affirming district court's grant of summary judgment, which was based in part on undisputed evidence extrinsic to complaint); *Int'l Bus. Machs. Corp.*, 363 F.3d at 148 ("A narrow, but widely recognized exception to the [four corners] rule allows an insurer to refuse or withdraw a defense if evidence extrinsic to those sources and '*unrelated* to the merits of plaintiff's action[,] plainly take the case outside the policy coverage.'") (emphasis added); *Philadelphia Indem. Ins. Co.*, 487 F. Supp. 3d at 187 (considering undisputed fact not at issue in underlying action); *Avondale Indus., Inc.*, 774 F. Supp. at 1425 (holding that a court may consider evidence extrinsic to the underlying complaint in a coverage action where it is *collateral* to the underlying action); *Allstate Ins. Co.*, 78 N.Y.2d at 45 ("In limited circumstances, a particular issue *expressly or necessarily decided* in a criminal proceeding may be given preclusive effect in a subsequent affected civil action." (emphasis added)); *Stein v. N. Assur. Co. of Am.*, 617 F. App'x at 31 (affirming court's refusal to consider "ambiguous" and disputed extrinsic facts).  *See also Houston Cas. Co.*, 2021 WL 4555526, at *4 ("More specifically, extrinsic evidence that goes directly to the merits of the claims in the underlying action cannot be used to defeat the duty to defend."); *City of New York*, 2017 WL 4386363, at *15 (refusing to consider extrinsic evidence that goes to issues relevant to the merits of the underlying complaints).

At oral argument, Arrowood cited for the first time to *County of Broome v. Aetna Casualty & Surety Company*, 146 A.D.2d 337, 340 (3d Dep't 1989).  In *County of Broome*, the court concluded that there was no "occurrence," and therefore no duty to defend because "the complaint in the Federal action does not allege a sudden or accidental discharge but rather a longstanding period of knowing and continuous discharges."  *Id.* at 342.  While the court also noted that the "record" supports the conclusion that the injury was expected or intended, *id.* at 341, it is unclear what record the court was considering – the underlying federal action, or the coverage action – or whether the underlying federal

allegations against the Diocese.  The Answer and Counterclaim summarizes at least twenty

cases in which numerous clergymen are alleged to have sexually abused children.  Ans. and

Counterclaim at 33-58, ¶¶ 79-207.[10]  Arrowood asserts that "in the Underlying Lawsuits, the

Diocese is alleged to have had prior knowledge of abuse and/or pedophilia by [the relevant]

priests."  *Id*. at 33, ¶ 81.  The Diocese is alleged to have been negligent in numerous ways,

including by hiring, retaining, and ignoring warnings about these clergymen.  *See id.* at 33-58,

¶¶ 79-207.  For instance, the *Koeneke* complaint alleges that employees of the Diocese

witnessed Charles Ribaudo, a priest employed at Holy Trinity Catholic High School, take the

plaintiff (who alleges he was sexually abused by the priest) to his apartment on campus alone.

*See Koeneke*, Index No. 900004/2019, Compl. ¶¶ 19-26.  Another complaint alleges that the

Diocese knew or should have known that Monsignor Edward Melton and Monsignor Patrick

Quigley sexually abused minors and still put them in direct contact with the minor plaintiff.

*See Mills*, Index No. 900040/2019, Compl. ¶¶ 50-52, 62-72; *see also Silvestre*, Index No.

900054/2019, Compl. ¶¶ 14-21 (alleging negligence with respect to sexual abuse by

Monsignor Melton and others of a child in late 1960s and early 1970s).  Yet another

complaint alleges that the Diocese knew or should have known about Monsignor Alan Placa's

---

action had been resolved.  Thus, the case is not determinative in establishing that courts can look to
any extrinsic evidence in evaluating the duty to defend, even if it overlaps with the issues being
litigated in the underlying action. Furthermore, the Second Circuit has questioned whether *County of
Broome* "is at odds with established New York precedent" regarding the meaning of "occurrence."
*City of Johnstown v. Bankers Standard Ins. Co*, 877 F.2d 1146, 1151 n.1 (2d Cir. 1989) (looking to the
complaint and policy language and holding that, under New York law, allegations that the city had
notice that landfill was leaking into groundwater did not relieve insurer of the duty to defend under
expected or intended exclusion).

[10] The underlying complaints will have to be thoroughly examined for purposes of a definitive finding
regarding the insured's obligations to defend and ultimately indemnify.

prior abuse of children and/or his propensity to abuse children.  *See Fernan*, Index No. 900037/2019, Compl. ¶ 4.

Whether, when, and how the Diocese received notice of the alleged sexual misconduct – or should have been aware of the potential for such misconduct – are central questions in the Underlying Actions.  *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (stating that a claim for negligent supervision or retention requires that "the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence" (internal citation omitted)); *Bouchard v. N.Y. Archdiocese*, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) ("A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of 'facts that would lead a reasonably prudent person to investigate that prospective employee.'" (quoting *Richardson v. City of New York*, No. 04-cv-05314 (THK), 2006 WL 3771115, at *13 (S.D.N.Y. Dec. 21, 2006)); *Waterbury v. N.Y. City Ballet, Inc.*, 205 A.D.3d 154, 423 (1st Dep't 2022) ("A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others.").

Therefore, the question of whether the Diocese "expected or intended" the injuries suffered by the child abuse survivors, or whether the Diocese had knowledge (based on investigations, complaints, or otherwise) prior to the acts of abuse, is central to whether the Diocese was negligent in the Underlying Actions.  *See City of Johnstown*, 877 F.2d at 1150 ("In general, what make injuries or damages *expected or intended* rather than accidental are the *knowledge* and intent of the insured." (emphasis added)); *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 845 (S.D.N.Y. 2018) (finding testimony about knowledge [of insured]

19

"showed that [insured] expected and intended the damage it remediated").  The Diocese's sexual abuse policies, trainings, and complaint procedures are similarly all at issue in the Underlying Actions for purposes of determining if the Diocese was negligent and should have prevented behavior that it knew or should have known would take place – the same bases that Arrowood is pointing to in order to determine whether the occurrences were known or "expected or intended."[11]

In addition, much of Arrowood's discovery requests span well beyond the Arrowood policy period (some even up to the present day, *see, e.g.*, Interrogatory No. 25),[12] which would not be relevant to the "occurrence" inquiry or known loss exclusion even if the materials did not overlap with the Underlying Actions.  The only information that would be relevant to whether the Diocese expected or intended abuse that occurred during the policy period would necessarily have to predate the occurrence and therefore predate the end of the

---

[11] Arrowood argues that the knowledge relevant to the "expected or intended" exclusion is not the same as the knowledge relevant to negligent supervision claims because the former looks to whether the insured expected "injuries that flowed from its own acts or omissions and/or those of its employees or agents" while the latter requires that the insured be "aware of specific prior acts or allegations against the employees."  Reply at 9.  Assuming this is a distinction with a difference, the discovery sought here does not make that distinction and broadly seeks information regarding the Diocese's knowledge about the sexual abuse allegations, prior misconduct or proclivities, and prior claims, which address issues that directly overlap with the merits of the Underlying Actions.  Simultaneous litigation of overlapping contested factual issues in the Underlying Actions is not appropriate in the context of evaluating the duty to defend.  *See, e.g.*, *City of New York*, 2017 WL 4386363, at *15 ("If an insurer could defeat its duty by proving, in a collateral action, the existence of a fact that *is* relevant to the merits of the underlying suit, it would follow that the insurer could subvert its obligation to defend against meritless suits. Worse, such a posture would place the insured in an untenable position: the insured would have to argue, in the declaratory action, that the fact in question is disputed, even as the insured made the *opposite* argument in the underlying action to try and defeat its own liability." (emphases in original)).

[12] *See* ECF No. 107, Ex. C (the "Diocese's Responses and Objections to Arrowood's Interrogatory Requests").  For purposes of this Opinion, the Diocese's Responses and Objections to Arrowood's Interrogatory Requests will be referred to hereinafter as "Resp. to Rogs."  The Diocese's Responses and Objections to Arrowood's Document Requests, *see* ECF No. 107, Ex. D, will hereinafter be referred to as "Resp. to Doc. Requests."

20

Arrowood policy period.[13]  Therefore, requests seeking information well beyond the Arrowood policy period are not relevant to these exclusions.

The Court is not persuaded by Arrowood's reliance on *Town of Moreau v. Orkin Exterminating Co.*, 165 A.D.2d 415 (3d Dep't 1991).  Arrowood argues in its papers that *Town of Moreau* demonstrates that it is proper for the court in a coverage action, under New York law, to consider extrinsic evidence related to the "expected or intended" inquiry.  Br. at 15; Reply at 5-6.  In *Town of Moreau*, the defendant (an extermination company) had been convicted of four counts of unlawful disposal of hazardous waste under New York law.  165 A.D.2d at 417.  The plaintiff Town of Moreau sued to seek abatement of the public nuisance and damages, and the defendant, the insured, brought claims against the insurers, alleging they had a duty to defend and indemnify the defendant under their policies because the dumping was an "occurrence" – *i.e.*, an accident which results in injury or damage "neither expected nor intended" by the insured.  *Id.*  At summary judgment, the trial court "took judicial notice of the criminal convictions, [and] found that [defendants'] dumping was intentional and therefore outside of the policy coverage."  *Id.*  The court held, applying principles of collateral estoppel, that the convictions precluded defendants from contending that the burial of pesticides was "unintentional" and therefore there could be no "occurrence."  *Id.* at 418-19.  As such, the insurers did not have a duty to defend or indemnify.  *Id.* at 419.  On appeal, the Appellate Division agreed, noting that the convictions were indeed outside the "boundaries of

---

[13] Counsel for Arrowood conceded as much at oral argument.  Nov. Tr. 16:8-23 ("If in 1977 there is a person who was involved in assessing allegations, claims, etc., etc., they know of these . . . , expected and intended, or the known loss, maybe not as much.  To late notice, absolutely."); 17:6-9 ("So as to [known] loss and expected and intended, as you framed that question for things post our policy period, I wouldn't dispute that [it is not relevant], but I do think it's relevant to other defenses.").

the complaint," but the court "need not ignore positive proof, extrinsic to the complaint, that assist in clarifying an ambiguous allegation." *Id.* at 418-19.

The Court finds *Town of Moreau* distinguishable from the case at hand. The court in *Town of Moreau* took judicial notice of the "positive proof" of a public criminal conviction in evaluating an insurer's duty to defend and indemnify. This does not support Arrowood's request for extensive discovery in the context of a duty to defend related to a *disputed* question of what the Diocese knew, expected or intended that is being fiercely litigated in the Underlying Actions (or will be once the bankruptcy stay is lifted). *See, e.g.*, *Philadelphia Indem. Ins.*, 487 F. Supp. 3d at 187 (considering an "undisputed . . . fact in the underlying litigation").[14]

Arrowood also argues that because the Underlying Actions will likely be resolved in the bankruptcy mediation process, and therefore will not include formal discovery of the Diocese's knowledge or other issues, it should be entitled to extensive discovery here regarding the knowledge of the Diocese in order to evaluate its coverage exclusions. Reply at 8. Arrowood was unable to provide any case that addressed discovery in an analogous circumstance. Nov. Tr. 11:15-23. The Court acknowledges that this matter involves complicated, widespread litigations, a contemporaneous bankruptcy filing, and the possibility that the Underlying Actions will settle through mediation without an ultimate finding, or even

---

[14] Arrowood argues that a 2002 Suffolk County Grand Jury report regarding the Diocese's responses to allegations of sexual abuse is similar to the conviction in *Town of Moreau* and should be considered by this Court in evaluating whether the Diocese "expected or intended" the injuries. Br. at 15-16. The question of whether the Court will ultimately consider this Grand Jury report – something that is altogether different than a criminal *conviction* – for purposes of determining whether Arrowood has a duty to defend or indemnify is not before this Court at this juncture. Presently before the Court is a motion to compel discovery. The Grand Jury report is publicly available so need not be compelled, Br. at 16; *see* Resp. to Doc. Requests at 12 (Document Request No. 20), and further documents related to it will not be compelled given the significant overlap with the Underlying Actions, as well as relevance and proportionality issues if the documents concern abuse after the policy period.

discovery, as to the central facts in the underlying disputes.  But bankruptcy filings and the potential for ultimate global settlement are not uncommon in litigation like this, and it does not change the legal framework the Court must adhere to when evaluating an insurer's alleged duty to defend prior to the conclusion of the underlying action – an evaluation that should center primarily on the four corners of the complaint and only, in some circumstances, limited extrinsic evidence.

In sum, broad discovery about the knowledge that the Diocese had during the policy period overlaps with central disputed issues in the Underlying Actions, and discovery regarding its knowledge after the policy period would not be relevant to the "expected or intended" or known loss exclusions.  Therefore, discovery of this information with respect to these exclusions will not be granted in the context of evaluating the duty to defend.  To be sure, Arrowood may eventually be entitled to a declaratory judgment that it did not have a duty to defend or indemnify the Underlying Actions on precisely this basis:  that the Diocese expected or intended the occurrences (the abuse) here or knew of the losses before renewing its Arrowood policies.  But at this juncture, in the face of New York law limiting what a court may consider when determining the duty to defend, Arrowood is not permitted to access the expansive discovery requested on these exclusions.  The Court is not holding that no discovery beyond the policies themselves would ever be appropriate in assessing known loss or expected or intended exclusions in the context of evaluating a duty to defend, but that the broad requests here unduly overlap with disputed issues in the Underlying Actions or are otherwise disproportional or irrelevant.

Accordingly, the Court denies Arrowood's motion to compel discovery as to the requests it contends are related to the expected or intended and known loss exclusions.

**B. Late Notice Exclusion**

Arrowood next seeks discovery purportedly related to the late notice exclusion, contending that the Diocese did not give its insurers timely notice of the occurrences of sexual abuse. *See generally Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 148-50 (2013) (holding that each incident of sexual abuse constitutes an occurrence). Under New York law, "an insurer may avoid what would otherwise be a duty to defend if timely notice of a claim or occurrence was not provided." *Travelers Indem. Co. v. Northrop Grumman Corp.*, 956 F. Supp. 2d 494, 509 (S.D.N.Y. 2013). "The obligation to provide notice accrues when the facts or circumstances known to the insured at the time would have suggested the possibility of a claim." *Id.* Arrowood argues that it is entitled to discovery related to whether the Diocese provided timely notice of each occurrence. Br. at 19-21. Arrowood's position is that the Diocese was obligated to notify its insurers of any early knowledge it had of the sexual abuse allegations covered by its policy regardless of, and prior to, the passage of the CVA. *Id.* at 19-20. The Diocese conversely argues that "[f]or many (if not most) of the claims, the Diocese had no notice of the occurrence until either a lawsuit was filed and served following the 2019 enactment of the CVA or a proof of claim was filed in the bankruptcy." Opp. Br. at 20. It further contends that, in any event, it otherwise only had notice of the allegations after the statutes of limitations had expired, and therefore there was no obligation to notify Arrowood because (until the CVA was enacted) there were no actionable claims. *Id.* at 20-21.[15]

---

[15] The Diocese seemed to acknowledge that there may also have been reports of abuse that were provided before the statute of limitations had expired. Nov. Tr. 51:9-11 ("So one category would be those that we learned about prior to the expiration of the statute of limitations.").

There are significant legal questions that will need to be addressed in order to ultimately evaluate whether the Diocese failed to timely notify Arrowood of the sexual abuse claims such that the late notice exclusion would bar the duty to defend.  A central question is whether the Diocese was obligated to notify Arrowood of claims for which the statutes of limitations had run, prior to the enactment of the CVA, or whether the Diocese can rely on a good faith belief in non-liability to excuse its delay.  *See id.* at 20 & n.13.  One apparently exemplar policy in the record requires notice "as soon as practicable," ECF No. 59, Ex. A ("Royal Policy") at 3, § 4(a), and the standard is one of reasonableness in light of all of the facts and circumstances.  *See Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 19 (1979) (concluding that "the provision that notice be given 'as soon as practicable' call[s] for a determination of what was within a reasonable time in the light of the facts and circumstances of the case at hand" (internal citations omitted)).  The parties agreed at oral argument that this is a contested legal issue here, *see* Nov. Tr. 19:11-20, 50:1-9, and the Court previously acknowledged the possibility that earlier notice may have been required, *see* Feb. Op. at 26-27 (finding that Counterclaim Five was not futile because "the Diocese may have been required to give notice of occurrences well prior to the enactment of the CVA").  There may also be a legal question as to whether Arrowood timely disclaimed coverage.  *See* Opp. Br. at 21 & n.15.  The Court will not resolve these ultimate legal and factual questions in the context of the present motion to compel (and without full briefing) but instead will consider the discovery requests assuming *arguendo* that notice prior to the enactment of the CVA in 2019 may be relevant if Arrowood is ultimately successful in its legal theories.

In terms of evaluating the discovery requests, determining whether an insurer received timely notification of a claim can be examined independent of the disputed issues in the Underlying Action.  *See, e.g.*, *Boutin v. Aetna Cas. & Sur. Co.*, 264 A.D.2d 434, 435 (2d

Dep't 1999) (determining, in coverage action, that late notice precluded duty to defend

underlying action).  Arrowood seeks discovery into when and how the Diocese first became

aware of any allegations of abuse (*see* Interrogatory Nos. 2-4, 14, 16, 23, 30-31, and

Document Request Nos. 28-29), information related to the reassignment of priests who may

have had allegations made against them (*see* Interrogatory Nos. 15, 24; Document Request

Nos. 5-6), information about the substance of allegations made during the policy period and

any subsequent investigations that were conducted (*see* Interrogatory Nos. 5, 6, 17, 20-21, 25-

26, 30; Document Request Nos. 7-12, 30), and information about what was reported to

Arrowood (*see* Interrogatory Nos. 18, 19; Document Request Nos. 14-16).  *See generally*

Resp. to Rogs; Resp. to Doc. Requests.  Upon review of the broad discovery requests, many

of which are overlapping, the Court concludes that several of the requests allegedly regarding

timely notice are either not relevant to the late notice exclusion or overlap with the disputed

issues in the Underlying Actions.  However, some requests are permissible.

   **(a) Interrogatory No. 19 and Document Request No. 16**

   First, the actual notices that the Diocese provided to Arrowood for claims of abuse that

occurred during the policy period are discrete, relevant items that can be produced without

impacting the Underlying Actions.  In Interrogatory No. 19, Arrowood requests the Diocese

"[i]dentify any and all claims and/or complaints of the sexual abuse of a minor taking place

during the policy periods of the Subject Arrowood Policies that were reported and/or tendered

to Arrowood."  Resp. to Rogs at 11.  Seemingly recognizing the appropriateness of this

request, the Diocese responded in part to this interrogatory and provided a "list of CVA

claims and/or complaints of sexual abuse of a minor taking place during the policy periods of

the Subject Arrowood Policies that were reported and/or tendered to Arrowood" as Exhibit A

to its responses to the Interrogatories.  *Id.*  Because it labels its list as "CVA claims and/or

complaints," it is unclear from the Diocese's response whether the Diocese included in its response claims or complaints tendered to Arrowood prior to the enactment of the CVA in 2019.  At oral argument, the Diocese clarified that it had searched for notices from before 2019, and has thus far located none.  Nov. Tr. 47:10-16.  The Diocese is ordered to provide a full response to Interrogatory No. 19, including a list of all claims or complaints that were reported and/or tendered to Arrowood prior to and after the enactment of the CVA.  If no such tenders were made, or the Diocese is unable to locate evidence of such tenders after good faith efforts, the Diocese should so indicate.

Relatedly, the Diocese must produce documents responsive to Document Request No. 16, which seeks documents generated between the formation of the Diocese until 2019 concerning "notice provided to/or tenders made to Arrowood" of any claims, complaints, or allegations of sexual abuse by the Diocese's employees or agents.  *See* Resp. to Doc. Requests at 11.  The Diocese states that "Arrowood has not identified any claims where the Diocese learned of a particular occurrence of abuse prior to the statute of limitations expiring and failed to provide notice to Arrowood at the time."  Opp. Br. at 20-21.  But such knowledge is within the Diocese's control – not Arrowood's.  This is precisely why the discovery is sought. The Diocese's remark that "Arrowood and the Diocese simply may never know if notice of any particular occurrence was provided during the time of the Arrowood coverage, which lasted two decades, ending in 1976," *id.* at 21 n.14, seems to indicate that the Diocese may no longer have any documents related to notices from so many decades ago.  But the lack of documents or information does not excuse responding to discovery requests; it simply necessitates a response that so indicates.  The Court therefore orders the Diocese to respond to this document request.

**(b) Interrogatory No. 26 and Interrogatory No. 25**

The Court will also order the Diocese to respond to Interrogatory No. 26, which requests the names of the person or persons who were responsible for determining whether and when to report sexual abuse claims or allegations to Arrowood.  *See* Resp. to Rogs at 14-15.  A list of names of those responsible for determining when and whether to tender a claim to Arrowood is a discrete request that may be relevant to Arrowood's claim regarding the late notice exclusion, and would not appear to unduly overlap with fact issues in the Underlying Actions.  Presumably agreeing with this assessment, at oral argument, the Diocese agreed to revisit this interrogatory and provide a full response.  Nov. Tr. 57:6-17.

Along the same lines, the Court will further require the Diocese to respond to Interrogatory No. 25 that requests the names of the people affiliated with the Diocese who were responsible for receiving and/or evaluating allegations or claims of sexual abuse. This is discrete information that may be relevant in evaluating whether and when information was reported to Arrowood, and does not impermissibly overlap with the merits.

**(c) Document Request No. 15**

Additionally, Document Request No. 15 seeks documents concerning "the Diocese's procedures, evaluation of, and/or decision-making process concerning whether and which claims, allegations and/or complaints" of sexual abuse by employees or agents of the Diocese "should be reported to Arrowood."  Resp. to Doc. Requests at 10.  In its response, the Diocese provides a description of the process after the CVA was enacted but does not speak to, or provide documents related to, the process before the CVA was enacted.  Documents regarding the process and procedures for reporting claims to Arrowood of sexual abuse, including whether and which claims to report, are relevant to Arrowood's late notice exclusion, and sufficiently separate from the merits of the Underlying Actions.  While counsel for the

28

Diocese represented at oral argument that he believed that no such documents exist, Arrowood expressed skepticism.  The Diocese agreed to revisit its search.  Nov. Tr. 58:18- 59:9.  Thus, the Court orders the Diocese to respond to this request and produce all responsive documents.

**(d) Document Request No. 11**

Aside from the notices that it received, Arrowood also seeks documents, from the formation of the Diocese to the present day, concerning claims or allegations of sexual abuse by the Diocese's employees or agents during the policy period that were made to the Diocese so that Arrowood can evaluate whether notice was or was not properly given to Arrowood of those claims.  *See, e.g.*, Resp. to Doc. Requests at 8-9.  Document Request No. 11 is the broadest of these requests, as it seeks "[a]ny and all documents generated at any time before the formation of the Diocese and present day, concerning claims, allegations[,] complaints and/or the potential to engage in such behavior made to the Diocese" or its agents regarding sexual abuse of minors during Arrowood's policy period.  *Id.* at 8-9.  Some of this information overlaps with the merits of the Underlying Action and will not be permitted.  Some of this discovery, however, is permissible.

The Court will compel production of documents in response to Document Request No.11, but limit it to documents that post-date the policy period and concern notices of claims or allegations that were previously undisclosed to the Diocese or its agents during the policy period.  The reason for this temporal division is that evidence regarding the Diocese's knowledge of claims of sexual abuse during the policy period overlaps with the Underlying Actions regarding abuse that took place during that policy period.  In other words, if the Diocese was informed of sexual abuse of an individual during the policy period by a particular priest, this would likely be relevant to the negligence claims in the Underlying Actions

29

depending on what the Diocese knew or should have known and when about that priest, such that the Diocese may be negligent or otherwise responsible for the abuse by that priest (which is why discovery was not permitted in the context of the known loss or expected or intended exclusions). However, *once the policy period ended*, any previously undisclosed claims that were brought to the Diocese regarding abuse during the policy period would not be relevant to what the Diocese knew or should have known, *prior to the abuse during the policy period*, for purposes of the underlying negligence action. The timing of that notification to the Diocese could, however, be relevant to whether the Diocese provided timely notice to Arrowood of the occurrence.[16] Therefore, the Court will permit discovery regarding Document Request No. 11, as limited herein.

Accordingly, the Court GRANTS Arrowood's motion to compel the Diocese to respond to: (1) Interrogatory Nos. 19, 25, and 26; and (2) Document Request Nos. 15, 16, and 11 (as limited above).

### C.  Failure to Cooperate Exclusion

Finally, Arrowood seeks discovery regarding its claim that it has no duty to defend given the Diocese's failure to cooperate. "Under New York law, where an insured's cooperation is required under the relevant policy, the deliberate failure of the 'insured to cooperate with the insurer is a breach of a significant condition precedent of the policy which bars the insured's recovery under the policy,' as well as the insurer's duty to defend."

---

[16] The Court has considered and denies Arrowood's motion with respect to the other discovery requests identified by citation in its brief with respect to the late notice exclusion because the requests are overbroad, disproportional, and too closely overlap with the merits of the Underlying Actions. Br. at 20 (citing Interrogatory Nos. 2-6, 14-18, 20, 21, 23-25, 30-31, and Document Request Nos. 5-10, 12, 14, 28, and 30). Notwithstanding this, the Diocese has responded at least in part to some of these requests, such as Interrogatory No. 30. And, given the overlap in the requests, documents relevant to some of these requests will likely be subsumed by the Court's order compelling limited discovery with respect to Document Request No. 11.

*Columbus McKinnon Corp. v. Travelers Indem. Co.*, 367 F. Supp. 3d 123, 152 (S.D.N.Y. 2018) (quoting *Fernandez v. Philadelphia Indem. Ins. Co.*, No. 16-cv-2533 (JCM), 2018 WL 502709, at *5 (S.D.N.Y. Jan. 19, 2018)).  The insurer has the burden to establish non-cooperation, and "courts have consistently held that the burden of proving the lack of co-operation is a heavy one indeed." *Thrasher v. U. S. Liab. Ins. Co.*, 19 N.Y.2d 159, 168 (1967).  "In particular, to raise non-cooperation successfully as a defense, the insurer must show: (1) that it acted diligently in seeking . . . the insured's cooperation; (2) that the efforts employed by the insurer were reasonably calculated to obtain the insured' co-operation; and (3) that the attitude of the insured, after his co-operation was sought, was one of willful and avowed obstruction." *Columbus McKinnon Corp.*, 367 F. Supp. 3d at 152 (quoting *Country-Wide Ins. Co. v. Preferred Trucking Servs. Corp.*, 22 N.Y.3d 571, 576 (2014)) (internal quotation marks omitted).

While an insured's cooperation obligations will depend in part on the language of the policy, courts applying New York law have found a failure to cooperate where, for example, an insured refuses to testify, provide documents, or coordinate with the carrier regarding settlement.  *See, e.g.*, *Stradford v. Zurich Ins. Co.*, No. 02-cv-3628, 2002 WL 31819215, at *4 (S.D.N.Y. Dec. 13, 2002) (finding breach of duty to cooperate for the "insured's willful failure to appear for an examination under oath" where the policy required cooperation "in the investigation or settlement of the claim"); *Levy v. Chubb Ins.*, 240 A.D.2d 336, 337 (1st Dep't 1997) ("The willful failure of an insured to submit to an examination under oath and to supply all relevant material in compliance with the provisions of an insurance policy has been held to constitute a material breach of contract, and to preclude recovery."); *Weissberg v. Royal Ins. Co.*, 240 A.D.2d 733, 734 (2d Dep't 1997) ("Thus, the insureds' willful failure to provide material and relevant documents, or to submit to an examination under oath, is a material

breach of the policy which bars recovery under the policy.").  These obligations to consult

regarding settlement, attend hearings and trials, assist in securing and giving evidence, and

otherwise cooperate with the insurer with respect to tendered claims are present in at least one

exemplar policy that has been provided to the Court in connection with a previous motion.

*See* Royal Policy at 3, § 4(c).

In reviewing the discovery requests Arrowood cites as relevant to the cooperation

exclusion, it appears that Arrowood is relying on this exclusion as a means of obtaining far-

ranging discovery into its other coverage exclusions, and, once again, into matters central to

the Underlying Action in terms of what the Diocese knew, and when it knew it, regarding

sexual abuse during the policy period.  Br. at 22.  For example, Interrogatory Nos. 2, 3, 14,

and 16 ask the Diocese to "[s]tate when and how the Diocese . . . first became aware of the

allegations" of sexual abuse; Interrogatory No. 4 asks the Diocese whether it "was aware of

allegations" of sexual abuse when it was formed in 1957; Interrogatory No. 15 asks the

Diocese to "[s]et forth Your understanding" of the reasons a certain priest had left previous

positions; and Interrogatory No. 23 asks the Diocese to state when it "accepted a candidate for

ordination with knowledge of complaints" of sexual abuse.  *See* Resp. to Rogs at 4-10.

Document Requests Nos. 1 and 2 seek all documents referenced in the Interrogatories and

Document Requests.  While Document Request No. 34 seeks "[a]ny and all documents

concerning the Diocese's processes, practices and/or policies for maintaining, retaining,

storing, keeping, transferring, removing, discarding and/or destroying" internal documents in

various categories, including the so-called Secret Files, this request also broadly seeks the

actual files about investigations into sexual abuse allegations, "including any police or law

enforcement reports, interviews and/or transcripts of the perpetrators or alleged victims of

abuse by such perpetrators . . . ."  *See* Resp. to Doc. Requests at 17.

Counsel for Arrowood conceded at oral argument that the duty to cooperate is triggered by actual notice to the insurer, which the parties agree at this point seems to be in 2019. Nov. Tr. 23:8-19. Thus, the Diocese's cooperation after 2019 is the relevant inquiry (unless and until there is evidence of tenders to Arrowood at an earlier date). The Court will not compel discovery of all of the requested information because much of what is requested does not relate to the Diocese's duty to cooperate after 2019 and some requests seek information about what the Diocese knew or should have known during the policy period, the central issue in the Underlying Actions. However, some of the discovery requests are appropriate.

**(a) Interrogatory Nos. 28 and 29; Document Request No. 34**

Whether or not the Diocese took appropriate steps to retain documents and produce them in the Underlying Actions would be both relevant to the Diocese's duty to cooperate and independent of the merits of the Underlying Actions. For example, Interrogatory No. 28 asks the Diocese to "[d]escribe the processes, practices and/or policies of the Diocese for maintaining, retaining, storing, keeping, transferring, removing, discarding, and/or destroying personnel files, 'Secret Files' or 'Secret Archive Files,' 'Confidential Files,' reports of investigations, psychological/psychiatric evaluations . . . and any other files related to allegations of sexual abuse of a minor against clergy . . . ." Resp. to Rogs at 15. To the extent that this request is limited to post-2019, when the Diocese sought coverage for the Underlying Actions, it would be relevant to whether the Diocese willfully or deliberately failed to cooperate in Arrowood's investigation and defense of the claims and does not overlap with the merits of the Underlying Actions. Therefore, the Court will compel a response to this request, as limited.

Similarly, Interrogatory No. 29 asks the Diocese to "[s]tate whether any of the files identified in Interrogatory No. 28 have been transferred, removed, discarded or destroyed . . . at any time between the formation of the Diocese and the present day" and to identify any that have been destroyed, as well as identify the location of the ones that remain. *Id.* at 16.  To the extent documents were destroyed or moved after 2019, when the Diocese sought coverage for the Underlying Actions, those facts are independent of the merits of the Underlying Actions and would be relevant to whether the Diocese willfully or deliberately failed to cooperate in Arrowood's investigation and defense of the claims.  For the same reasons, the Court will compel the Diocese to produce documents in response to Document Request No. 34 but will limit this to documents after 2019 concerning the "Diocese's processes, practices and/or policies for maintaining, retaining, storing, keeping, transferring, removing, discarding, and/or destroying" the documents listed in the document request.

By allowing this limited discovery, the Court is not deciding whether the Diocese ultimately has a duty to cooperate with an insurer who is actively litigating against it.  The Diocese argues that it does not.  Opp. Br. at 23-24 (citing to *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 39 N.Y.S.3d 864, 869-70 (N.Y. Sup. Ct. 2016) (holding that the insured's obligation to cooperate is excused when the insurer disclaims coverage)); *see also* Steven Plitt, *et al.*, Couch on Insurance § 199:9 (3d ed. 2022) ("The duty applies only when the insurer and insured are in a relationship of some trust to each other. . . . Otherwise, the insurers' access to confidential defense information would enable the insurers to both demand cooperation from their insured in defense of the underlying actions and to disavow coverage.").  Without deciding that ultimate issue (and given the lack of full briefing), the Court is simply allowing limited discovery regarding the Diocese's document retention processes and protocols after it placed its insurer on notice of the present claims.

34

Accordingly, the Court GRANTS Arrowood's motion to compel with respect to: (1) Interrogatory Nos. 28 and 29, limited to after 2019; and (2) Document Request No. 34, limited to after 2019.

### III.    IRCP Discovery

Finally, Arrowood seeks discovery regarding claims that have already been settled as part of the Independent Reconciliation and Compensation Program ("IRCP").  Br. at 23.  In its brief in opposition, the Diocese asserts that it "has decided not to pursue its claim for reimbursement of IRCP payments, so Arrowood's IRCP-related discovery is moot."  Opp. Br. at 25.[17]  While Arrowood relayed at oral argument that it is still seeking this information because it may lead to other relevant information, *see* Nov. Tr. 25:5-15, the Court will not grant the motion to compel this discovery because it is not proportional to the needs of this case.  The Diocese is no longer seeking insurance coverage from Arrowood for the IRCP matters and Arrowood is already receiving some discovery regarding the claims that are still at issue.

### IV.    Conclusion

For the foregoing reasons, Arrowood's motion to compel is GRANTED in part, with the limitations described herein, and DENIED with respect to all other discovery requests.  Subject to the limitations set forth above, the Diocese shall respond to Interrogatory Nos. 19, 26, 25, 28 and 29, and Document Request Nos. 11, 15, 16, and 34.

---

[17] At oral argument, the Diocese informed the Court that it plans to seek permission to file a Second Amended Complaint, dropping this claim.  Nov. Tr. 35:15-36:1.

IT IS HEREBY ORDERED that **within two weeks of the date of this Order**, the

parties shall file a Proposed Case Management Plan and Scheduling Order consistent with the

Court's Individual Rules.

Dated:  December 13, 2022
        New York, New York

                                        SO ORDERED.

                                        _____
                                        JENNIFER L. ROCHON
                                        United States District Judge